**Jack W. McRAE, Appellant,**

v.

**Erias HYMAN, Appellee.**

**No. 94–SP–70.**

District of Columbia Court of Appeals.

Argued Sept. 11, 1995.

Decided Dec. 7, 1995.

---

1. *See In re Ingram*, 584 A.2d 602 (D.C.1991); *In re Hessler*, 549 A.2d 700 (D.C.1988); *In re Gilchrist*, 488 A.2d 1354 (D.C.1985).

Bruce P. Beddow, Chantilly, VA, appointed by the court, for appellant.

Mary L. Wilson, Assistant Corporation Counsel, with whom Garland Pinkston, Acting Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on a memorandum in lieu of brief, Washington, DC, for appellee. Vanessa Ruiz was Acting Corporation Counsel at the time appellee filed its motion for summary affirmance.

Before STEADMAN and KING, Associate Judges, and BELSON, Senior Judge.

KING, Associate Judge:

In this case we are asked to decide whether a numerical scoring system made applicable by regulation to parole determinations by the Parole Board ("Board"), creates a liberty interest so that the Board's denial of parole, despite an inmate's favorable score, amounts to a denial of due process of law. In two recent cases, while deciding allied issues, we essentially answered that question in the negative. *See Davis v. Henderson,* 652 A.2d 634 (D.C.1995); *White v. Hyman,* 647 A.2d 1175 (D.C.1994). We now make explicit what was implied by those cases: The District's parole scheme confers discretion to grant or deny parole and the scoring system creates no liberty interest overriding the exercise of that discretion.

## I.

After Jack M. McRae was denied parole on June 16, 1993, he challenged that decision by petitioning the Superior Court, *pro se,* for a petition for a Writ of Habeas Corpus. After a response was filed by the government, the trial court conducted a hearing and denied the petition. In this appeal from that denial, McRae contends that the Board regulations confer a liberty interest in parole which was denied him, that the Board violated due process and equal protection in not formally applying the scoring system provided by

those regulations, and that in any event, the denial of parole was arbitrary and capricious. We reject each claim and affirm.[1]

## II.

Because McRae's extensive criminal history and his past unsatisfactory adjustment while on probation, parole, and other release bears upon the decision made by the Board, we will provide the factual background in some detail. McRae's criminal history is derived principally from the presentence investigation ("PSI") prepared for his most recent conviction which is part of the record in this appeal.

In 1965, when he was nineteen years old, McRae was charged with unauthorized use of a motor vehicle. After what was apparently a guilty plea to a lesser misdemeanor offense, he was given a suspended sentence and placed on probation. For reasons not revealed by the record, that probation was later revoked and a 180–day sentence imposed.

In 1972 McRae was convicted of first-degree burglary, carnal knowledge, assault with a dangerous weapon, and assault with intent to rape. Those convictions resulted in an aggregate sentence of not less than four and not more than twelve years.

In 1980 McRae was charged with robbery, found guilty of attempted robbery, and sentenced to a term of ten to thirty months. Although it would appear that the 1980 robbery charge arose before the expiration of the sentence imposed for the 1972 offenses, we cannot determine from the record whether McRae was on parole or any other form of release at the time he committed the 1980 offense. What is clear, however, is that McRae's most recent conviction (for armed rape committed in 1982), for which he is presently serving time, occurred while McRae was released on parole for the 1980 offense.

In the 1982 case the PSI reports that McRae, in the early morning hours, while armed with a knife, entered the apartment of a woman he did not know, where he found her asleep. McRae awakened the victim and forced her to engage in sexual intercourse and to commit two separate acts of oral sodomy. After a guilty plea to armed rape in 1984, he was sentenced to a term of six to twenty years. It is from that sentence that McRae has been denied parole in this case.

During the late 1980's and early 1990's McRae appeared before the Board on several occasions but was denied parole. In January 1991, McRae was placed on pre-parole work-release, at a half-way house, and the Board, on April 15, 1991, granted parole to begin on or after June 29, 1991. McRae was never formally paroled, however, because he escaped from the half-way house and remained at large for 148 days. Because of the escape, the order of parole was set aside in November 1991 and rescinded at a hearing in April 1992.

McRae received another parole hearing on January 7, 1993, but the Board postponed consideration in order to obtain a psychiatric evaluation. The psychiatrist who conducted that evaluation concluded that McRae was "unlikely to make satisfactory independent adjustment in the community." On June 16, 1993, the Board formally denied parole. It subsequently issued an "addendum" setting forth the reasons for its action. McRae then filed the instant petition.

## III.

McRae's principal contention is that the District of Columbia's regulations relating to parole creates a constitutionally protected liberty interest that creates "an expectancy in parole that cannot be denied absent constitutionally sound reasons." *See Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).[2] He further argues that

---

1. McRae's due process challenge to the date selected by the Board for parole reconsideration must be rejected on the authority of *White, supra,* 647 A.2d at 1179–81 (parole regulations do not create a protected liberty interest in a specific parole rehearing date).

2. Given our disposition of this appeal, we need not explore here the degree, if any, to which this test has been made more restrictive in parole matters by *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

because the numerical scoring system, provided for in the regulations, indicated that he should have been paroled, the Board's decision denied him liberty without due process of law. We disagree.

Before turning to the regulations that McRae relies upon, we first examine the governing statute. It provides:

> Whenever it shall appear to the Board of Parole that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his release is not incompatible with the welfare of society, and that he has served the minimum sentence imposed or the prescribed portion of his sentence, as the case may be, the Board *may* authorize his release on parole upon such terms and conditions as the Board shall from time to time prescribe. While on parole, a prisoner shall remain in the legal custody and under the control of the Attorney General of the United States or his authorized representative until the expiration of the maximum of the term or terms specified in his sentence without regard to good time allowance.

D.C.Code § 24–204(a) (1989 Repl.) (emphasis added). The regulations incorporate this discretionary approach:

> In accordance with D.C.Code, § 24–204 the Board shall be authorized to release a prisoner on parole in its *discretion* after he or she has served the minimum term or terms of the sentence imposed or after he or she has served one-third (⅓) of the term or terms for which he or she was sentenced, as the case may be, if the following criteria are met:
>
> (a) The prisoner has observed substantially the rules of the institution;
>
> (b) There is reasonable probability that the prisoner will live and remain at liberty without violating the law; and
>
> (c) In the opinion of the Board, the release is not incompatible with the welfare of society.

3. 28 D.C.M.R. § 204.2 (1987).

4. 28 D.C.M.R. § 204.4–204.16 (1987).

5. 28 D.C.M.R. § 204.17 (1987).

28 D.C.M.R. § 200.1 (1987) (emphasis added). When this regulation was adopted, the Board also adopted a scoring system "to guide the Board in making the decision whether to grant to deny parole." *White, supra,* 647 A.2d at 1179. It is this scoring system that McRae contends mandates his release on parole. Before addressing that contention, a brief discussion of the scoring system will be helpful.

## IV.

The first step in the scoring system calls for the determination of a factor called the Salient Factor Score ("SFS").[3] In determining the SFS, numerical values are assigned for each of the following factors:

(a) Prior convictions and adjudications;

(b) Prior commitments of more than thirty (30) days;

(c) Age at commission of current offense;

(d) Recent commitment-free period;

(e) Status of prisoner at time [of] current offense; and

(f) History of heroin or opiate dependence.[4]

This process results in an SFS ranging from zero to ten, which is sub-divided into four parole risk categories: high, moderate, fair, and low.[5]

The risk level is then adjusted up or down based upon certain pre-incarceration factors (e.g., whether the offense of conviction involved violence, the use of a weapon, or drug trafficking) and post-incarceration factors relating to the inmate's institutional adjustment.[6] These adjustments result in a factor called the Point Assigned Grid ("PAG") with a numerical assignment of between zero and five. For subsequent hearings, the Board begins with the PAG point score from the previous hearing and either adds or subtracts one point depending upon whether the inmate's institutional adjustment was negative or positive.[7] Low numbers (0–2) call for a grant of parole, higher numbers

6. 28 D.C.M.R. § 204.18 (1987).

7. 28 D.C.M.R. Appendix 2–2 (1987).

(3–5) indicate a denial of parole.[8] Although the Board did not formally calculate a PAG for McRae at the most recent hearing, the Department of Corrections had done so, determining the PAG to be 2 as of October 8, 1992.[9] Because a PAG of 2 indicates that parole "shall be granted," McRae insists the Board denied him due process of law when parole was denied. We will now consider that contention.

## V.

As noted earlier, the governing statute, D.C.Code § 24–204(a), is phrased in discretionary terms, i.e., "the Board may authorize ... release." The parole regulations mirror the statute. *See* 28 D.C.M.R. § 200.1 (1987). As we observed in *White v. Hyman:*

> Decisions regarding parole shall be "in [the Board's] discretion." [28 D.C.M.R.] § 200.1. Although a numerical scoring system is created to guide the Board in making the decision whether to grant or deny parole, the purpose of the system is "to enable the Board to exercise its discretion." [28 D.C.M.R.] § 204.1. Where the Board, in the exercise of that discretion, departs from the numerical system, it shall "specify in writing those factors which it used." [28 D.C.M.R.] § 204.22. Departures must be explained, but they are not proscribed.

647 A.2d at 1179. In *White* we considered whether 28 D.C.M.R. § 104.2 (1987), adopted as part of the same regulatory process that established the scoring system, which specified the outer limit in terms of time for the scheduling of the next parole hearing, created a liberty interest fixing the date prescribed. We held that no such liberty inter-

est was created because the non-binding character of § 104.2 is apparent from still another regulation,[10] adopted at the same time, which authorizes the Board to select an appropriate reconsideration date *"notwithstanding any other provision of this section." Id.* at 1180 (emphasis in original).

Further, in *Davis v. Henderson,* we held that the scoring system under attack here did not supersede the discretion the Board possessed pursuant to statute. 652 A.2d at 634. In *Davis,* an inmate who had been sentenced before the numerical system was adopted, challenged the applicability of the numerical system to parole determination related to him on ex post facto grounds. Davis argued that the scoring system pointed to a denial of parole while the Board, before the scoring system was adopted, had discretion to grant parole if it wished. In short, argued Davis, because the scoring system made it more difficult for him to gain parole, the regulation creating the scoring system amounted to a forbidden ex post facto law.[11] We rejected that claim, pointing out that the same underlying statute, i.e. § 24–204(a), applied both before and after adoption of the numerical system, and the extent of the Board's discretion was not changed by the scoring system. *Id.* at 635. We concluded that the scoring system was, therefore, not binding upon the Board. Rather the scoring system provided no more than "flexible guideposts for use in the exercise of discretion." *Id.* at 637–38 (quotation omitted).

 In sum, the District's parole system is grounded in the exercise of discretion by the Board, with a numerical system to aid in the exercise of that discretion. The numerical system is not a rigid formula, however, be-

---

**8.** 28 D.C.M.R. § 204.19 (1987).

**9.** We reject McRae's claims that the Board's failure to calculate an SFS or a PAG, in this instance, itself amounts to both a denial of due process and equal protection. The Board was aware of the PAG calculated by the Department of Corrections ("DOC") and that both the DOC and its own hearing examiner were recommending parole. Therefore, when it considered McRae's application the Board knew there were strong indicators favoring parole. As we hold *infra,* however, it was well within the Board's discretion to discount those indicators and deter-

mine, for the reasons given, that parole should not be granted. *See* D.C.M.R. § 204.22 (1987) ("Board may, in unusual circumstances, waive the SFS and the pre and post incarceration factors ... to grant or deny parole").

**10.** 28 D.C.M.R. § 104.11 (1987).

**11.** McRae was also sentenced before the scoring system was adopted, but, understandably, because the scoring system had the opposite effect upon him than it had on Davis, he does not make the same argument.

cause the Board is not required to either grant or deny parole based upon the score attained. This is reflected by § 204.22,[12] which makes clear the Board's authority, in unusual cases, to ignore the results of the scoring system and either grant or deny parole in the individual case, conditioned upon the Board's setting forth in writing those factors it relied on in departing from the result indicated by the scoring system. Therefore, because the "statute and [r]egulation[s] vest in the Board substantial discretion in granting or denying parole ... they lack the mandatory character which the Supreme Court has found essential to a claim that a regime of parole gives rise to a liberty interest." *White, supra,* 647 A.2d at 1180.[13]

### VI.

■ Finally, we examine whether the Board complied with § 204.22, which requires a written explanation when the results of the scoring system are waived. We conclude that it did. For example, in its addendum to the order denying parole, the Board set forth a number of grounds for denying parole to McRae: repeated failure under supervision;[14] a history of criminally related alcohol abuse; extensive record; the offense of conviction involved unusual cruelty; and although given the opportunity, he had made little or no effort toward rehabilitation. Some or all of these factors had been grounds for previous denials. In this instance the Board added another ground, i.e., that the inmate needed appropriate services to "minimize risk to the community when actually released to parole."

■ The latter ground echoed the finding of Dr. Coleman, the psychiatrist who conducted the examination ordered by the Board in January 1993, who reported, *inter alia,* that McRae "displays little empathy for others"; has "very poor impulse control"; and "turns readily to alcohol and violence when frustrated." Dr. Coleman concluded:

> Mr. McRae is unlikely to make a satisfactory independent adjustment in the community. Since early adolescence he has been unable to maintain a satisfactory adaptation to society, and he seems to have functioned at his best level with the structure and controls that are placed on him while he is incarcerated. Although he appears to recognize that he is more comfortable institutionalized, he prefers to see himself as the victim rather than the perpetrator. Unfortunately, given his history and personality structure, there is nothing I can think to recommend that might improve his chances to achieve a satisfactory adjustment.

In light of these conclusions it is evident that the Board could readily determine, in the words of the governing statute, § 24–204(a), that there was no reasonable probability that McRae would "live and remain at liberty without violating the law" or that release would be compatible "with the welfare of society."[15] *See Bennett v. Ridley,* 633 A.2d 824, 826 (D.C.1993) ("the court does not review the merits of the Board's decision").

Therefore, we conclude that McRae, not having demonstrated any entitlement to pa-

---

12. 28 D.C.M.R. § 204.22 (1987).

13. We note that the parole regulations were recently amended in order to further clarify the Board's substantial discretion. *See* 41 D.C.Reg. 5193 (July 25, 1994) at § 52 (amending several sections of title 28 of the municipal regulations by replacing the word "shall" with the word "may").

14. McRae had been released under supervision after conviction on at least three previous occasions, i.e., probation for the 1965 offense, parole in the 1980 offense, and a half-way house in this case. Each time he failed to adjust: his 1965 probation was revoked, he committed the instant offense while on parole for the 1980 offense, and he escaped from the half-way house.

15. For the same reasons we reject McRae's contention that the denial of parole was arbitrary and capricious. We also reject McRae's contention, made for the first time at oral argument, that the Board violated 28 D.C.M.R. § 204.1 (1987) ("parole release decision falling outside the numerically determined guidelines shall be explained by reference to the specific factors as stated in Appendices 2–1 and 2–2"). We do not ordinarily consider contentions raised for the first time at that stage of the appeal, *Ramos v. United States,* 569 A.2d 158, 162 n. 5 (D.C.1990); nonetheless, we conclude the Board complied with § 204.1.

role, cannot successfully complain of the Board's order denying him release. Accordingly, the judgment of the trial court is hereby

*Affirmed.*