**Anthony T. HALL, Appellant,**

v.

**John S. HENDERSON, et al., Appellees.**

**No. 94–SP–868.**

District of Columbia Court of Appeals.

Argued Feb. 8, 1996.
Decided Feb. 27, 1996.

</div>

1048

Alan Dumoff, appointed by this court, Washington, DC, for appellant.

Mary L. Wilson, Assistant Corporation Counsel, with whom Charles F.C. Ruff, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellees.

Before FERREN, STEADMAN, and KING, Associate Judges.

FERREN, Associate Judge:

On January 28, 1994, the Board of Parole ("Board") denied appellant Anthony T. Hall parole and set his next parole hearing five years hence (a five year "set-off"). Hall challenged that decision by petitioning the Superior Court, *pro se*, for a writ of habeas corpus, which was denied without a hearing on June 28, 1994. Hall principally contends on appeal that the Board of Parole's Policy Guidelines ("Guidelines") confer a liberty interest in the parole set-off decision, and that the Board thereby violated due process, as well as its own Guidelines, when it scheduled his next parole hearing for December 6, 1998. We affirm.

## I.

On July 2, 1981, Hall, while on parole from a nine year sentence for distributing narcotics, shot a man and a woman with a .38 caliber revolver after Hall and a companion confronted them about a debt. Hall pled guilty on September 20, 1982, to charges of assault with intent to kill while armed, D.C.Code §§ 22–501, –3202 (1989 Repl.) armed burglary, *id.* §§ 22–1801, –3202, and carrying a pistol without a license, *id.* § 22–3203. On August 31, 1982, before his sentencing, Hall was convicted in federal district court of possession of a postal service key with intent to use, 18 U.S.C. § 1704 (1994), and unlawful and knowing possession of stolen mail matter, *id.* § 1708.

On November 2, 1982, Hall was sentenced to a term of fifteen years to life in prison for the charges arising from the July 2, 1981, armed assault. On December 3, 1982, a federal court sentenced Hall to a prison term of ten years for the federal offenses to run consecutively to Hall's earlier, Superior Court sentence. Based on his aggregated sentences, Hall was required to serve a minimum of eighteen years and four months in prison. Because of the possibility of educational and good behavior credits, Hall's parole hearing originally was scheduled for October 15, 1993.

After initial incarceration in the District's Lorton Reformatory, Hall was transferred to a number of federal correctional facilities, including penitentiaries in Oxford, Wisconsin; Terre Haute, Indiana; and Leavenworth, Kansas. Hall remained in federal custody until July 1993, when he was transferred to the District's Occoquan Facility at Lorton, Virginia. Hall's parole hearing was then rescheduled for December 23, 1993. Before

presenting his parole request to the District's Board of Parole, Hall met with a hearing officer who, upon review of Hall's case, recommended denial of parole and a two-year set-off entitling Hall to a parole hearing on December 23, 1995.

At the hearing on December 23, 1993, Hall presented evidence that he had successfully completed various educational programs while in prison, had a favorable work history, and had a good relationship with staff. The Board also was informed, however, that Hall had continued to abuse drugs despite his incarceration, and that under the District's scoring system for determining parole eligibility, Hall should not be paroled at that time. The Board also considered the nature of the local and federal crimes Hall had committed.

On January 28, 1994, the Board denied Hall's request for parole. A majority of the Board refused to adopt the hearing officer's recommendation of a two year set-off; instead, the Board scheduled a five year set-off entitling Hall to a parole rehearing in 1998. Pursuant to its own Policy Guidelines, the Board identified two factors governing its decision to schedule a five-year set-off: (1) Hall's repeated or extremely serious negative institutional behavior, i.e., his continued use of drugs, and (2) his unusual cruelty to the victims in the armed offenses. The Board also instructed Hall to participate in psychological counseling and in an intensive drug rehabilitation program.

Hall sought a writ of habeas corpus in Superior Court challenging the Board's decision to schedule a five year set-off. He argued that application of municipal regulations governing parole set-offs enacted after his 1982 convictions violated the Ex Post Facto Clause of the Constitution, and that the set-off violated both the Due Process Clause and the Guidelines. Hall's petition was denied without a hearing. He noted a timely appeal, contending only that the Board's set-off determination violated due process and the Board's Guidelines.

## II.

### A.

■ Hall contends that the Guidelines create a liberty interest in its parole set-off decision entitling him to due process protections under *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1978). It is well-settled that the District of Columbia's parole statute and related municipal regulations do not, under *Greenholtz,* confer upon an inmate a liberty interest in parole set-off decisions. *See Brown–Bey v. Hyman,* 649 A.2d 8, 10 (D.C.1994) (noting after *Greenholtz* analysis that "the Board's determination of an appropriate set-off date does not implicate due process considerations"); *White v. Hyman,* 647 A.2d 1175, 1179–81 (D.C.1994) (concluding after analyzing D.C.Code § 24–204(a) and 28 DCMR § 104.11 that the District does not confer a liberty interest under *Greenholtz*); *Jones v. Braxton,* 647 A.2d 1116, 1117 (D.C.1994) (per curiam) (applying *Greenholtz* analysis and concluding no liberty interest created by 28 DCMR §§ 104.1–104.2, –104.11). We have never decided, however, whether the Guidelines confer such an interest. *See Brown–Bey,* 649 A.2d at 10 n. 6.

■ Although the Due Process Clause "shields from arbitrary or capricious deprivation those facets of a convicted criminal's existence that qualify as 'liberty interests,'" *Harper v. Young,* 64 F.3d 563, 564 (10th Cir.1995), those interests are created, if at all, by state law unless they inhere in the Due Process Clause. *See Sandin v. R.D. Conner,* —— U.S. ——, ——, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995); *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460–61, 109 S.Ct. 1904, 1908–09, 104 L.Ed.2d 506 (1989). The right to a particular set-off date for a parole hearing is not inherent in the Due Process clause. Thus, the central question presented—whether a state has bestowed a protectable liberty interest under *Greenholtz* and succeeding cases—traditionally has turned on whether the regulation or statute in question places "substantive limitations on official discretion." *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). In other words, does the regulatory language mandate a particular result, or is the decision essentially discretionary?

■ Recently, however, in *Sandin,* decided after the trial court ruled in this case, the Supreme Court announced that *Greenholtz* and cases applying it had "strayed from the real concerns undergirding the liberty protected by the Due Process Clause." — U.S. at ——, 115 S.Ct. at 2300. The Court accordingly rejected as misguided a liberty interest inquiry based solely upon an examination of statutory or regulatory language. Under *Sandin,* state-created liberty interests now "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

Specifically, *Sandin* addressed a situation in which the court of appeals had held that prison authorities had imposed disciplinary segregation for misconduct without complying with a prison regulation that permitted a finding of guilt only if based on substantial evidence. The Supreme Court reversed, holding that the state, through failure to comply with its regulation, could not be said to have violated due process because the prisoner's "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." — U.S. at ——, 115 S.Ct. at 2301. *Sandin* accordingly put a limit on the kinds of regulations that can serve to create a liberty interest.

■ We have no occasion to consider whether *Sandin* has now provided room for a state-created liberty interest based on state action not grounded in formal regulations. We are satisfied that the exercise of official discretion over set-off dates for parole hearings, if done—as in this case—under a regime of policy guidelines established by the parole authorities themselves, cannot be held to create a liberty interest under *Sandin* if there is not a liberty interest under *Greenholtz.* Under any interpretation of *Sandin,* we see no possibility that scheduling of a set-off date can create an "atypical and significant hardship" unless the state can be said to have placed such a substantive limitation on the exercise of official discretion that an official failure to honor the prescribed limitation

(in the form of mandatory scheduling) would be characterized as a deprivation of liberty under *Greenholtz.* If the official scheduling of a parole set-off date under the Guidelines is not subject to a substantive limitation on official discretion that would have created a liberty interest under *Greenholtz,* then there is no room for the possibility that *Sandin's* "atypical and significant hardship" test provides a broader constitutional protection for parole set-off decisions.

We therefore proceed with a traditional *Greenholtz* analysis, beginning with the relevant provisions of the Guidelines.

**B.**

The Guidelines were adopted on April 27, 1992, "to ensure consistency and equity in the establishment of parole reconsideration dates." Board of Parole, Policy Guidelines § II (April 27, 1992). The "Rationale" for the Guidelines is, in part, to ensure that the Board implements "prescribed set-offs for the purpose of establishing reconsideration hearing dates when parole is denied or revoked." *Id.* § V. The "prescribed set-offs" generally scheduled when an inmate has been denied parole are codified in the District's municipal regulations. 35 D.C.Reg. 455 (1988), to be codified as 28 DCMR §§ 104.1–104.2.

These District municipal regulations provide two "ordinarily" applicable set-offs for an inmate who has been denied parole—six months and one year—based on the length of the prison sentence the inmate is serving. Section 104.1 states:

> When the Board denies parole and orders reconsideration for a person serving a maximum sentence of less than five (5) years, reconsideration shall ordinarily occur within six (6) months.

35 D.C.Reg. 455, to be codified as 28 DCMR § 104.1 For prisoners serving terms of five or more years, § 104.2 provides:

> When the Board denies parole and orders reconsideration for a person serving a maximum sentence of five (5) years or more, reconsideration shall ordinarily occur within twelve (12) months.

*Id.* § 104.2. Under these regulations, however, the prescribed six month and one year set-offs are not unalterable. Section 104.11, recognizing that the prescribed set-offs may not be suitable for every inmate denied parole, provides:

> Notwithstanding any other provision of this section, the Board may order a parole reconsideration date it determines to be appropriate.

*Id.* § 104.11.

Similarly, the Board's Guidelines, rather than requiring the Board to apply the set-offs prescribed in §§ 104.1–104.2, also give the Board discretion to deviate from the prescribed set-offs. The "Rationale" for the Guidelines includes enabling the Board, in its discretion, to "establish a reconsideration date outside the prescribed set-offs where certain factors exist." Guidelines § V. Consequently, the overall "Policy" of the Guidelines on scheduling parole hearings after a parole denial is stated as follows:

> A. Set-offs When Parole is Denied:
>
> 1. When the Board denies parole for any offender, it shall ordinarily schedule a reconsideration date within the prescribed set-offs unless certain factors support imposition of an alternative set-off. The length of the set-off is based on the term of the sentence imposed by the courts, and may not exceed the date on which release from incarceration becomes mandatory....
>
> 2. The Board, in its discretion, may schedule a reconsideration date later than the prescribed set-off if one or more aggravating factors are present....
>
> 3. The Board, in its discretion, may schedule a reconsideration hearing date prior to the prescribed set-off if one or more mitigating factors are present....

*Id.* § VI(A)(1)–(3).

The Guidelines then set forth a number of "aggravating" and "mitigating" factors to assist the Board in deciding whether to sched-ule a set-off of longer or shorter duration than the prescribed set-offs. In cases where a longer than prescribed set-off might be more suitable, the Guidelines provide:

> The aggravating factors considered by the Board include but are not limited to the following:
>
> a. There has been repeated failure under any form of community supervision (probation, parole, bail, diversion program).
>
> b. The instant offense involved ongoing criminal behavior or leadership role in an organized, criminal venture (e.g., an organized drug distribution operation).
>
> c. There is a lengthy history of criminally-related alcohol and/or substance abuse.
>
> d. There is a history of repetitive sophisticated, assaultive, or fraudulent criminal behavior (including the current offense).
>
> e. There is an unusually extensive or serious prior record (at least five felony convictions).
>
> f. The instant offense involved unusual cruelty to victim(s) or involved especially vulnerable victims (e.g., children or elderly victims of assaultive or fraudulent behavior).
>
> g. There has been repeated or extremely serious negative institutional behavior.
>
> h. There has been opportunity but little/no effort made toward rehabilitation/preparation for remaining crime-free if returned to the community.
>
> i. The offender poses a serious threat to self or others and adequate resources are not available in the community.

*Id.* § VI(A)(2).[1]

## C.

 Hall contends that the Guidelines require the Board to impose the six month and

---

1. Section VI(A)(3), dealing with a set-off of shorter duration than those prescribed by §§ 104.1–104.2, provides:

 The mitigating factors considered by the Board include but are not limited to the following:

 a. There has been exceptional program achievement.
 b. There is a record of exclusively trivial offenses.

one year set-offs prescribed in §§ 104.1–104.2 unless one or more of the "aggravating factors" listed in § VI(A)(2) of the Guidelines apply. Because of this purported limitation on the Board's discretion to deviate from the prescribed set-offs, Hall argues that the District has created a liberty interest in the set-off determination protected by the Due Process Clause. *See Olim,* 461 U.S. at 249, 103 S.Ct. at 1747; *Kentucky Dep't of Corrections,* 490 U.S. at 463, 109 S.Ct. at 1910. We cannot agree. Since the Guidelines vest in the Board substantial discretion to deviate from the prescribed set-offs, they lack the mandatory character essential to a claim that a regulation gives rise to a liberty interest under *Greenholtz* and later cases. *See Olim,* 461 U.S. at 249, 103 S.Ct. at 1747; *Kentucky Dep't of Corrections,* 490 U.S. at 463, 109 S.Ct. at 1910.

It is true the Guidelines require the Board to have some basis for establishing a set-off beyond those prescribed in §§ 104.1–104.2. Section V of the Guidelines provides: "The Board, in its discretion, may establish a reconsideration date outside of the prescribed set-offs *where certain factors exist.*" Guidelines § V (emphasis added). Section VI similarly provides: "The Board, in its discretion, may schedule a reconsideration date later than the prescribed set-off *if one or more aggravating factors are present.*" *Id.* § VI(A)(2) (emphasis added).

The Guidelines, however, clearly do not limit the Board's decision-making authority when deviating from the prescribed set-offs by forcing it to consider only the factors specifically articulated in the Guidelines. Before setting out the factors in § VI(A)(2), the Guidelines expressly say that "[t]he aggravating factors considered by the Board *include but are not limited to* the following." *Id.* § VI(A)(2) (emphasis added). Reflecting the notion that the factors do not circumscribe the Board's discretion, the Guidelines define an "aggravating factor" as:

> factor(s) considered by the Board *for guidance* in determining whether to establish a reconsideration hearing date later than the prescribed set-off.

*Id.* § V(D) (emphasis added).[2] Consequently, although potentially relevant to any Board decision to deviate from the prescribed set-offs, the § VI(A)(2) "aggravating factors" in the Guidelines do not dictate that decision.

While the Guidelines, therefore, do require the Board to have some basis for deviating from the prescribed set-offs, they plainly do not place "substantive limitations," *Olim,* 461 U.S. at 249, 103 S.Ct. at 1747, on the Board's discretion to schedule a set-off date outside those that the regulations prescribe. The Guidelines undoubtedly reflect, rather than limit, the discretion that the District's municipal regulations and parole statute already vest in the Board's set-off determinations,[3]

c. There has been a substantial crime-free period since the last offense.

d. There has been a substantial previous period in custody on other sentence(s) or the prisoner faces a substantial period of time on additional committed sentences.

e. There has been substantial cooperation with the Government that has not been otherwise rewarded.

f. There has been a change in the availability of community resources leading to better parole prognosis or the prisoner has exceptional community resources available.

g. There is a poor medical prognosis.

h. There have been other changes in circumstances.

i. The offender has put forth maximum effort to participate in assigned programs, but opportunities for programming were not available.

Guidelines § VI(A)(3).

**2.** The Guidelines similarly define a "mitigating factor," some of which are set out at VI(A)(3), as:

factor(s) considered by the Board for guidance in determining whether to establish a reconsideration hearing date earlier than the prescribed set-off.

*Id.* § VI(A)(3), *supra* note 2.

**3.** The District's parole statute in relevant part provides:

Whenever it shall appear to the Board of Parole that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his release is not incompatible with the welfare of society, and that [the inmate] has served the minimum sentence imposed or the prescribed portion of his sentence, as the case may be, the Board may authorize his release on parole upon such terms and conditions as the Board shall from time to time prescribe.

D.C.Code § 24–204(a) (1989 Repl.).

*see White,* 647 A.2d at 1180; *Brown–Bey,* 649 A.2d at 10; *Jones,* 647 A.2d at 1117, and in its parole decisions generally, *see McRae v. Hyman,* 667 A.2d 1356, 1361 (D.C. December 7, 1995) (District's numerical scoring system does not limit Board's discretion to grant or deny parole); *White,* 647 A.2d at 1180 (District has substantial discretion to grant or deny parole).

We note, moreover, that Hall's argument is particularly unpersuasive because it relies upon language found in the self-regulating guidelines enacted by the Board, not in a statute or municipal regulation. The Supreme Court has made clear that there can be no liberty interest absent a legitimate claim of entitlement to a substantive interest. *See Olim,* 461 U.S. at 250–51, 103 S.Ct. at 1748. Such an entitlement is particularly difficult to establish by pointing to rules adopted by the Board of Parole to guide its own decision-making process in implementing a statute and regulations, not primarily to serve prisoner interests.

■■■■ The Supreme Court in *Greenholtz* noted the "crucial distinction" between "being deprived of a liberty one has, as in parole, and being denied a conditional liberty one desires." *Greenholtz,* 442 U.S. at 9, 99 S.Ct. at 2105. The possibility of parole from a shorter set-off, like the possibility of parole itself raised in *Greenholtz,* "provides no more than a mere hope that the benefit will be obtained . . . a hope which is not protected by due process." *Id.* at 11, 99 S.Ct. at 2105. We therefore conclude that the Guidelines fail to create a liberty interest under *Greenholtz* analysis, *see Olim,* 461 U.S. at 249, 103 S.Ct. at 1747; *Greenholtz,* 442 U.S. at 13–14, 99 S.Ct. at 2106–07, and, perforce, fail to create a liberty interest under *Sandin.* The Board's set-off determinations do not impose the "atypical and significant hardship on the inmate" now deemed necessary to establish a liberty interest. *Sandin,* —— U.S. at ——, 115 S.Ct. at 2300.

In the absence of any liberty interest implicated by the Board's decision to schedule a five year set-off, we need not examine that decision for a violation of due process. Because Hall has "no liberty interest in obtaining parole . . ., he cannot complain of the constitutionality of procedural devices attendant to parole decisions." *Orellana v. Kyle,* 65 F.3d 29, 32 (5th Cir.1995); *see also Allison v. Kyle,* 66 F.3d 71, 74 (5th Cir.1995).

### III.

■■■ The Guidelines are not formal "regulations" in the sense that this court has used that term to require agency compliance with its own promulgated regulations. *See Abdullah v. Roach,* 668 A.2d 801, 806–07 (1995); *Vaughn v. United States,* 598 A.2d 425, 433 (D.C.1991). The Guidelines, however, may serve the same purpose that formal regulations serve—in this case "[t]o ensure consistency and equity in the establishment of parole reconsideration dates." Guidelines § II. It is interesting to note, moreover, that the Board promulgated the Guidelines under authority of D.C.Code § 24–201.2 and 28 DCMR § 104. We need not here decide whether the Guidelines create legally enforceable prisoners' rights, for, even if they do, Hall's remaining objections to the Board's set-off decision have no merit.

Hall specifically contends the Board (1) based its decision to impose a five year set-off on erroneous information, thereby considering an impermissible factor under the Guidelines; (2) provided an inadequate explanation of its reasons for scheduling a five year set-off; (3) and abused its discretion by "double counting" the violent nature of Hall's armed offenses.

### A.

Under its Guidelines, the Board was required to set forth in writing its reasons for departing from the one year prescribed set-off normally applicable to an inmate, such as Hall, serving a sentence of five or more years. Section VII of the Guidelines requires:

> Where the Board denies parole and establishes a date for reconsideration that is outside of the prescribed set-offs, each aggravating factor or mitigating factor applicable to the decision shall be specified in writing.

Guidelines § VII(A)(1). Pursuant to this provision, the Board informed Hall that its decision to deviate from the prescribed set-off was based upon Hall's "unusual cruelty to the victim in the instant offense," *id.* § VI(A)(2)(f), and his "repeated or extremely serious negative institutional behavior." *Id.* § VI(A)(2)(g).

Hall points out that the hearing official who examined him mistakenly noted in his prepared report that Hall had "assaulted a U.S. letter carrier at gunpoint—removed postal keys." Hall accordingly contends that this error in describing his federal offense may have served as the basis for the Board's conclusion that Hall demonstrated unusual cruelty in the "instant offense" (the assault with intent to kill while armed).

We have said that "on a petition for a writ of habeas corpus, the court does not review the merits of the Board's decision, but only 'whether the petitioner has been deprived of his [or her] legal rights by the manner in which the revocation hearing was conducted,' in order to determine whether there has been an abuse of discretion." *Bennett v. Ridley*, 633 A.2d 824, 826 (D.C.1993) (citations omitted); *see also Jones*, 647 A.2d at 1117 n. 4 (declining to reach claim that Board relied upon inaccurate information). We observe, however, that Hall ignores the fact that the Board surely was thinking of his non-federal offenses in saying that he "displayed unusual cruelty to the victim in the instant offense." [4] Based on his conviction for assault with intent to kill while armed, the Board had information that Hall had shot and wounded two individuals, and that the shooting took place in the presence of one of the victim's children. By reference to the "instant offense," the Board reached the conclusion that Hall displayed unusual cruelty in his local crimes alone, without considering his federal offenses.

### B.

Hall also contends that the Board's explanation for deviating from the prescribed set-off was inadequate under the Board's Guidelines. This contention, too, must be rejected. Instead of requiring a narrative explanation, the Guidelines require only that "each aggravating or mitigating factor applicable to the decision [to deviate from the prescribed set-off] be specified in writing." Guidelines § VII(A). By listing the aggravating factors the Board concluded were applicable—Hall's negative institutional behavior and cruelty to the victim in the instant case—the Board satisfied the minimal requirements of the Guidelines.

### C.

Finally, Hall argues that the Board abused its discretion by "double counting" the violent nature of Hall's instant offense, using it both as a factor to deny Hall's parole eligibility and as a basis for deviating from the prescribed set-off.

Double counting has served as the basis for appeals from decisions by the U.S. Parole Commission. *See Walker v. United States*, 816 F.2d 1313, 1316 (9th Cir. 1987) (reviewing parole commission's decision for double counting); *Romano v. Baer*, 805 F.2d 268, 271 (7th Cir.1986) (same). It occurs when the Parole Commission, in setting a parole hearing or rehearing date, relies upon an aggravating factor to generate a presumptive parole date for a prisoner under the federal parole guidelines, and then applies the same factor in determining whether to extend the date beyond the presumptive date set out under the guidelines. The abuse of discretion arises because an inmate is inordinately prejudiced whenever a single unfavorable factor is given twice its weight for the same determination.

Applying the scoring system used in making parole decisions, the Board made an initial assessment of the risk of paroling Hall.[5] Hall's score was then adjusted ac-

---

4. We reject Hall's claim that the Board erred in finding that his armed assault constituted "unusual cruelty," clearly a merits determination.

5. The Salient Factor Score (SFS) is the first step in the District's scoring system for determining parole eligibility. In determining the SFS, the Board of Parole assigns numerical values to various factors, including prior convictions and adjudications, prior commitments of more than thirty days, and age at commission of the current of-

cording to the Board's Point Assignment Grid. *See* 28 DCMR § 204.18 (1987) (listing factors incorporated into Point Assignment Grid). Under that Grid, because Hall presented a risk of "violence" on the basis of his criminal record, his score was adjusted upward. The Board then rejected Hall's parole request. Later, the Board factored in Hall's "unusual cruelty to the victim in the instant offense" in deciding that Hall's set-off should be longer than municipal regulations prescribe. Hall argues that this amounted to impermissible "double counting" of the violent nature of his offenses.

Hall's argument fails for two reasons. First, he assumes that the risk of "violence" factor used to adjust his parole eligibility score was the same as the "unusual cruelty to the victim in the instant offense" factor used to arrive at the five-year set-off. The conclusions that Hall was a "violent" offender and that he had displayed "unusual cruelty," while potentially related, did not necessarily serve as identical factors for the Board, especially since the Board may have concluded that Hall was "violent," in part, on the basis of crimes he had committed before the present offenses. In particular, the Board considered evidence showing that, when he was sixteen, Hall had been charged with manslaughter for shooting another youth. While the factors may have overlapped, we cannot conclude, without more, that they were the same factors.

Second, even if the factors were the same, no "double counting" occurred because they were used in two separate determinations. The assessment that Hall presented a risk of "violence" was used to decide whether he should be granted parole under the Board's scoring system. *See* 28 DCMR § 204. Independent of that determination, the Board was required to schedule Hall's next hearing date after his parole had been denied. It was in the context of this latter determination that the Board weighed Hall's "unusual cruelty to the victim in the instant offense" as a factor in its deliberations. Guidelines § VII(A)(2)(f). Therefore, even if we accept the claim that the factors at issue here were the same, no "double counting" occurred; the

fense. The process results in an initial score

information contributed to two distinct determinations.

\* \* \*

We conclude, accordingly, that the trial court properly dismissed Hall's petition for writ of habeas corpus. The judgment of the trial court is

*Affirmed.*

ranging from zero to ten. 28 DCMR § 204.4–17.