Michael ELLIS, et al., Appellees/Cross–
Appellants,

v.

DISTRICT OF COLUMBIA, et al.,
Appellants/Cross–Appellees.

Nos. 95–7090, 95–7109.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 30, 1996.

Decided May 28, 1996.

Mary L. Wilson, Assistant Corporation Counsel, argued the cause, for appellants/cross-appellees. With her on the briefs were Charles F. Ruff, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel. Garland Pinkston, Jr., Principal Deputy Corporation Counsel, Washington, DC, entered an appearance.

Edwin H. Wheeler, argued the cause, for appellees/cross-appellants. With him on the briefs was Jonathan M. Smith, Washington, DC.

Before HENDERSON, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Opinion concurring in part and dissenting in part filed by Circuit Judge TATEL.

RANDOLPH, Circuit Judge:

In this class action by prisoners and former prisoners of the District of Columbia, brought under 42 U.S.C. § 1983, the district

court ruled that the Due Process Clause of the Fifth Amendment required the District of Columbia Board of Parole to hold parole hearings far enough in advance of prisoners' parole eligibility dates so that prisoners may be released on that date if the Board's decisions are in favor of parole; to provide certain material to prisoners to assist them in understanding the Board's parole decisions in their cases; and, with respect to parole revocations, to offer prompt "preliminary hearings" after parole warrants are executed and to provide parole revocation hearings no more than 90 days thereafter. This is an appeal from the permanent injunction issued to enforce the court's ruling.

## I

We will deal first with the district court's judgment that some, but not all, prisoners have a due process liberty interest in parole, an interest protected by the procedural rules imposed in the court's order concerning the Board's parole eligibility determinations.

## A

■ Because the Constitution itself does not create any liberty interest in parole (see *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103–04, 60 L.Ed.2d 668 (1979)), such an interest must emanate from state law, or in this case, District of Columbia law. The statutory law of parole, contained in the District of Columbia Code, is as follows:

> Whenever it shall appear to the Board of Parole that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his release is not incompatible with the welfare of society, and that he has served the minimum sentence ... the Board may authorize his release on parole.

1. The full text of D.C.Mun.Regs. tit. 28, § 200.1 is:

> In accordance with D.C.Code, § 24–204 the Board shall be authorized to release a prisoner on parole in its discretion after he or she has served the minimum number of term or terms of the sentence imposed or after he has served one-third (⅓) of the term or terms for which he or she was sentenced, as the case may be, if the following criteria are met:

D.C.CODE § 24–204(a). We held in *Price v. Barry*, 53 F.3d 369 (D.C.Cir.1995) (per curiam), that this statute created "no 'expectancy of release' entitling a prisoner to due process protections." *Id.* at 371. Our reasoning was straightforward and rested on the language of § 24–204(a): even if a prisoner established everything the statute required, the Board of Parole still had discretion to deny parole. Yet state laws may only give rise "to a constitutionally protected liberty interest if they contain substantive limitations on official discretion, embodied in mandatory statutory or regulatory language." *Id.* at 370.

While plaintiffs thus cannot establish a liberty interest stemming from the District's parole statute, they say one may be derived from parole regulations the Board adopted in 1987 pursuant to its authority "to establish rules and regulations for its procedure." D.C.CODE § 24–201a (1987), *superseded by* D.C.CODE §§ 24–204.1–.3. Like the statute, the regulations state that the Board may "release a prisoner on parole in its discretion" after the prisoner has served one-third of his sentence, provided that the prisoner substantially complied with prison rules, there was a reasonable probability the prisoner would not violate the law upon release, and releasing the prisoner would not be "incompatible with the welfare of society." D.C.Mun.Regs. tit. 28, § 200.1.[1]

The regulations establish a scoring system to guide the Board's parole decisions. § 204.1. Each parole candidate is assigned a "Salient Factor Score" to assist in determining the risk of releasing the prisoner. As the regulations put it, the "SFS" serves as "one of the factors used in calculating parole eligibility pursuant to the provisions of this section." § 204.2. To calculate the SFS, the

> (a) The prisoner has observed substantially the rules of the institution;
> (b) There is reasonable probability that the prisoner will live and remain at liberty without violating the law; and
> (c) In the opinion of the Board, the release is not incompatible with the welfare of society.

Board assigns a numerical value for each of six categories:

- Prior convictions and adjudications (ranging from 0–3),
- Prior commitments of more than thirty days (0–2),
- Age at the time of the commission of the current offense (0–2),
- Recent commitment-free period (0–1),
- Status of the prisoner at the time of commission of the current offense (0–1), and
- History of heroin or opiate dependence (0–1).

§ 204.4; App. 2–1, at 2–31 to –32. These categories and the determinants of the numerical values are described in detail in §§ 204.5–.16. The numerical values assigned to these six categories are added to determine the SFS, which can range from 0–10. App. 2–1, at 2–31 to –32. Prisoners with an SFS of 9–10 are regarded as low risk; those with scores of 6–8 are regarded as fair risk; those with scores of 4–5 are regarded as moderate risk; and those with scores of 0–3 are regarded as high risk. § 204.17; App. 2–1, at 2–32.

The Board modifies a prisoner's risk category by adding or subtracting points for pre- and post-incarceration factors. Points are added if:

- The prisoner's current conviction involved violence against a person, the use of a dangerous weapon, or drug distribution; or if the prisoner has two or more previous convictions for these types of crimes; or
- The prisoner has committed serious disciplinary infractions.

§ 204.18(a)–(h); App. 2–1, at 2–32 to –34. A point is subtracted if the inmate has demonstrated sustained achievement in prison programs, industries or work assignments. § 204.18(i); App. 2–1, at 2–33 to –34. Application of these pre- and post-incarceration

factors to the prisoner's risk category yields the "total point score," which can range from 0–5. §§ 204.19–.20; App. 2–1, at 2–34. In initial parole hearings, the regulations state that adults with total point scores of 0–2 and youth offenders with a total point score of 0 "shall be granted" parole; adults with total points scores of 3–5 and youth offenders with total point scores of 1–5 "shall be denied" parole. §§ 204.19–.20; App. 2–1, at 2–34, 2–36. In later parole hearings, the Board begins with the total point score from the previous hearing and either adds or subtracts one point depending upon whether the inmate's institutional adjustment was negative or positive. Adult and youth offenders with point scores of 0–3 "shall be granted" parole; adult and youth offenders with point scores of 4–5 "shall be denied" parole. § 204.21; App. 2–2, at 2–37.

The regulations permit the Board to deviate from the outcome suggested by the total point score "in unusual circumstances." § 204.22.[2] Appendix 2–1 lists six reasons for denying parole despite a low total point score:

- Repeated failure under parole supervision,
- Current offense involves on-going criminal behavior,
- Lengthy history of criminally related alcohol abuse,
- History of repetitive sophisticated criminal behavior,
- Unusually extensive and serious prior record (at least five felony convictions), and
- Unusual cruelty to victims.

App. 2–1, at 2–34 to –35. The list in Appendix 2–1 also contains categories for "Other" and "Other change in circumstances." *Id.* at 2–35. The Board supplemented these appendices with an "Addendum to Board Order" which laid out four additional factors that could justify deviating from the numerical guidelines.[3]

---

**2.** Section 204.22 reads in full:

The Board may, in unusual circumstances waive the SFS and the pre and post incarceration factors set forth in this chapter to grant or deny parole to a parole candidate. In that case, the Board shall specify in writing those

factors which it used to depart from the strict application of the provisions of this chapter.

**3.** The Addendum listed the following countervailing factors:

The district court, impressed by the mandatory language of §§ 204.19–.21, held that inmates with low total point scores had an "expectation of release" and thus a liberty interest in parole. As the court saw it, the command of the regulations—prisoners with low total point scores "shall be released"—so limited the Board's discretion that the "total point score effectively determine[d] the parole decision." Although the Board could disregard the parole determination indicated by its guidelines, the Board could do so only for unusual circumstances. The court therefore concluded that the Constitution required the Board to conduct parole hearings of prisoners with low total point scores sufficiently in advance of their parole eligibility dates that they could be released as soon as they became eligible and to provide all prisoners denied parole with more information explaining the reasons for the denial.

### B

■ By the time of the district court's decision, the Supreme Court had settled on an approach to the Due Process Clause that made the existence, or lack thereof, of a liberty interest in parole turn on the language of the regulations governing parole. While there "is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence" (*Greenholtz*, 442 U.S. at 7, 99 S.Ct. at 2104), a state's parole regulations might require release after a parole board "determines (in its broad discretion) that the necessary prerequisites exist" (*Board of Pardons v. Allen*, 482 U.S. 369, 376, 107 S.Ct. 2415, 2419, 96 L.Ed.2d 303 (1987)), in which event

the state has created an expectation of release rising to the level of a liberty interest within the meaning of the Due Process Clause. *Greenholtz, Allen,* and *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), came to stand for the proposition that a state's "use of 'explicitly mandatory language,' in connection with the establishment of 'specified substantive predicates' to limit discretion, forces a conclusion that the state has created a liberty interest." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 463, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989).

Where the Supreme Court stands on this subject is no longer certain. *Sandin v. Conner,* ——— U.S. ———, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), a case dealing with prison disciplinary proceedings, roundly criticized the methodology just described. The *Sandin* majority thought the Court had gone astray, particularly in *Hewitt v. Helms,* when it made liberty interests depend on the "somewhat mechanical dichotomy" between state regulations that were mandatory and those that were discretionary. *Id.* at ———, 115 S.Ct. at 2298. The five Justices in the *Sandin* majority, and two in dissent, agreed that this approach had created undesirable disincentives for states to cabin the discretion of prison officials: states that set down strict guidelines for prison officials exposed themselves to constitutional claims; those that set down no rules to control prison officials immunized themselves from such claims. *Id.* at ———, 115 S.Ct. at 2299; *id.* at ———, at 2303 (Ginsburg, J., joined by Stevens, J., dissenting).[4] The Court also be-

___50 The offender has had repeated failures under parole supervision.

___51 The instant offense(s) involve(s) on-going criminal behavior.

___52 The offender has a lengthy history of criminally-related alcohol abuse.

___53 The offender has a history of repetitive, sophisticated criminal behavior.

___54 The offender has an unusually extensive or serious prior record, including at least five felony convictions.

___55 The instant offense(s) involve(s) unusual cruelty to victim(s).

___56 The offender has engaged in repeated or extremely serious negative institutional behavior.

___57 The offender has a lengthy history of criminally-related substance abuse.

___58 The offender had the opportunity, but made little or no effort toward rehabilitation or preparation for remaining crime-free if released to the community.

___59 The offender needs program and/or rehabilitation services to minimize risk to the community when actually released to parole.

4. This message was not lost on D.C. officials. On July 25, 1994, the D.C. Council amended §§ 204.19–.21 to replace the word "shall" with "may" and repealed Appendices 2–1 and 2–2. Technical Amendments Act of 1994, D.C.Act 10–302, § 52(c)–(f), 41 D.C.Reg. 5193, 5203. This legislation became effective on May 16, 1995,

lieved that "the *Hewitt* approach" had insinuated federal courts into the management of state prisons. "The time has come," the Court said, "to return to the due process principles ... established" before the mandatory-discretionary dichotomy took hold. *Id.* at ——, 115 S.Ct. at 2300. While state laws may still create liberty interests protected by the Due Process Clause, henceforth "these interests will generally be limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

The *Sandin* test relates to claims dealing with the day-to-day management of prisons. It seems ill-fitted to parole eligibility determinations. Parole is, in the words of *Sandin,* surely a "freedom from restraint" but the restraint itself will always be an "ordinary incident of prison life." *Id.* In other words, if a prisoner is denied parole—if, in terms of *Sandin,* the prisoner is restrained— the prisoner will never suffer an "atypical" or "significant hardship" as compared to other prisoners. He will continue to serve his sentence under the same conditions as his fellow inmates. There is no room for an argument that the denial of parole always imposes extraordinary hardship by extending the length of incarceration, and therefore gives rise to a liberty interest protected by the Due Process Clause. That is simply a recasting of the argument—rejected in *Greenholtz,* 442 U.S. at 7–11, 99 S.Ct. at 2103–06, and unaffected by *Sandin*—that a liberty interest in parole stems directly from the Constitution without regard to state law. And yet given *Greenholtz* and *Allen,* an inferior court could not accept an argument that, no matter what state law provides, a prisoner's interest in parole can never amount to a liberty interest protected by the Due Process Clause.

Where does this leave us? *Sandin* did not overrule *Greenholtz* or *Allen* or any other Supreme Court decision. —— U.S. at —— & n. 5, 115 S.Ct. at 2300 & n. 5. To be sure, it abandoned the reasoning embodied in those opinions, at least insofar as applied to prisoners challenging the conditions of their confinement or the administration of the prison. In this situation, we think the only course open to us is to comply with the rule expressed in *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989): "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Id.* at 484, 109 S.Ct. at 1921–22; *see also American Trucking Ass'ns v. Smith,* 496 U.S. 167, 180, 110 S.Ct. 2323, 2332, 110 L.Ed.2d 148 (1990); *United States v. $639,- 558 in United States Currency,* 955 F.2d 712, 718 (D.C.Cir.1992). Until the Court instructs us otherwise, we must follow *Greenholtz* and *Allen* because, unlike *Sandin,* they are directly on point. Both cases deal with a prisoner's liberty interest in parole; *Sandin* does not. And so we return to the language of the regulations.

Our independent review of the regulations leads us to doubt whether the district court correctly estimated the degree to which the numerical guidelines control the Board's judgment. The first section of the chapter on parole recognizes the Board's authority "to release a prisoner on parole *in its discretion.*" D.C.Mun.Regs. tit. 28, § 200.1 (emphasis added). The calculations done under the regulations are intended to "enable the Board to *exercise its discretion* when, and only when, release is not incompatible with the safety of the community." § 204.1 (emphasis added). The regulations characterize the Salient Factor Score as "an actuarial parole prognosis aid to assess the degree of

---

two months after the district court's decision. *See* D.C.Law 10–255, 42 D.C.Reg. 2729 (1995). The parties agree that these changes did not moot this case. If we were to conclude that the unamended regulations did create a liberty interest, it is possible that prisoners who committed their crimes prior to the amendment's effective

date would be entitled to have their parole determined in accordance with the old regulations. *Compare California Dep't of Corrections v. Morales,* —— U.S. ——, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), *with Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981).

risk posed by a parolee" (§ 204.3) and as "one of the factors used in calculating parole eligibility pursuant to the provisions of this section" (§ 204.2). Without more, these provisions call into question the district court's conclusion that the numerical scores provided by the regulations "effectively determine[ ] the parole decision." Furthermore, the regulations explicitly authorize the Board to disregard the numerical guidelines simply by referring to "the specific aggravating or mitigating factors as stated in Appendices 2–1 and 2–2." § 204.1. Among such factors listed in these Appendices are "Other" and "Other change in circumstances." App. 2–1, at 2–35; App. 2–2, at 2–38.

"Other" is scarcely constraining language. It suggests the following interpretation: under the regulations, a prisoner with a low total point score shall be granted parole unless the Board, in the exercise of its discretion, believes there is some other reason for not granting him parole. The case of the lead plaintiff, Michael Ellis, is revealing in this regard. Ellis had been sentenced to 18–75 years for abducting women at gun point on three separate occasions and brutally raping them. Before January 1988, Ellis was a "serious management problem" who had to be repeatedly disciplined for misconduct. In the two years immediately preceding his initial parole hearing, Ellis avoided any disciplinary infractions and completed his General Equivalency Diploma, a Drug Alcohol Abuse Treatment Program, and several other self-help programs. Because Ellis had only a single prior criminal conviction, was only 21 years old at the time of the rapes, had not been imprisoned or otherwise restricted immediately prior to his conviction for those offenses, and was not addicted to heroin or opiates, Ellis received a Salient Factor Score of eight, indicating that he was a fair parole risk. Pursuant to the regulations, his risk level was adjusted up for the violence of his crimes, but was adjusted back down for his model conduct during the most recent two years of his imprisonment. In the end, he received a total point score of 1. According to the reasoning of the district court, this score entitled him to parole, subject to a high

level of supervision. § 204.19(b). Instead, the Board refused to follow the indicated result and denied parole. In making this decision, the Board relied in part on one of the countervailing factors specifically listed in Appendix 2–1 and in the Board's Addendum—the fact that Ellis's offenses involved unusual cruelty to his victims. The Board was also concerned that a recent psychological assessment had described Ellis as "impulsive and rebellious with low tolerance for frustration and prone to act out with physical aggression." This last factor was not listed in Appendix 2–1 or in the Board's Addendum. But the Board apparently did not think this precluded it from relying on the unlisted factor. Instead, the Board invoked the residual category of "Other" as the basis for denying parole.

An opinion of the District of Columbia Court of Appeals, handed down after the district court decision in this case, ends all doubt about the meaning of the Board's regulations. *McRae v. Hyman*, 667 A.2d 1356, 1357 (D.C.1995), presented the same issue now before us: whether the District of Columbia parole regulations create "a constitutionally protected liberty interest." *Id.* at 1358. In order to decide that issue the Court of Appeals recognized, as have we, that it first had to construe the regulations with an eye to determining the extent to which the Board's statutory discretion to grant or deny parole had been circumscribed. *Id.* at 1358–59. As to the scoring system, the court viewed this as merely a guide, not a "rigid formula," and not a constraint on the discretion conferred upon the Board by the parole statute. *Id.* at 1360–61. Under § 204.22 of the regulations, if the Board wished to disregard the results of the scoring system it merely had to say so in writing. *Id.* at 1361. The "Board is not required to either grant or deny parole based upon the score attained." *Id.* The Court of Appeals therefore "ma[d]e explicit what was implied in" two of its recent parole decisions [5]—namely, that the statute and the regulations vest substantial discretion in the Board to grant or deny parole and that the regulations lack the sort of "manda-

---

5. *White v. Hyman*, 647 A.2d 1175 (D.C.1994);     *Davis v. Henderson*, 652 A.2d 634 (D.C.1995).

tory character" needed to support a liberty interest. *Id.* at 1357, 1367.

Although we are not bound by the D.C.Court of Appeals's interpretation of the Constitution, we must respect its construction of D.C. law. *See Mills v. Rogers,* 457 U.S. 291, 300–04, 102 S.Ct. 2442, 2448–51, 73 L.Ed.2d 16 (1982); *cf. Clemons v. Mississippi,* 494 U.S. 738, 747, 110 S.Ct. 1441, 1447–48, 108 L.Ed.2d 725 (1990). Since both our own and the D.C.Court of Appeals's reading of the District's regulations indicate that parole is never *"required* after the Board determines that the necessary prerequisites exist" (*Allen,* 482 U.S. at 376, 107 S.Ct. at 2419) and that a prisoner's low total point score does not "compel[ ] the Board to grant a prisoner release" (*Price,* 53 F.3d at 371), we hold that the regulations do not give any prisoners a liberty interest in parole. The procedures the district court imposed in the name of due process were therefore unwarranted.

## II

This brings us to the matter of parole revocation. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), established that a state may not terminate a parolee's conditional liberty consistent with the Due Process Clause unless it follows "some orderly process, however informal." *Id.* at 482, 92 S.Ct. at 2601. Our concern therefore is with the constitutional adequacy of the procedures the District of Columbia already has in place.

## A

Under the Board's regulations, whenever there is probable cause to believe that a parolee has committed a crime or otherwise violated the conditions of parole, the Board or a member of the Board may issue a warrant for the parolee's arrest. D.C.Mun. Regs. tit. 28, §§ 217.1–.7. After the warrant is executed, the parolee "has the right to have a preliminary interview ... at or reasonably near the place of the alleged parole violation or arrest, without unnecessary delay." § 219.1. In the preliminary interview, the parolee is informed of the parole conditions allegedly violated and is informed of his right "to written notice of the claimed viola-

tions ...; disclosure ... of evidence against him ...; and opportunity to be heard in person, to present witnesses and documentary evidence, and to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation) at a hearing before the Board or a member of the Board; and a written statement of the Board's final determination." § 219.1(b). The parolee is also told of the "approximate time, place, and purpose(s) of the revocation hearing." § 219.1(c). Revocation hearings must be held "at or reasonably near the place of the alleged parole violation or arrest, within sixty (60) days of the preliminary interview." § 219.3. Board policy requires that revocation hearings be held within 30 days after the Board is notified of the execution of a warrant.

In its memorandum opinion, the district court concluded that "[s]ince the defendants do not offer preliminary hearings to any alleged parole violators, they are in clear violation of the requirements of *Morrissey.*" Furthermore, because the evidence showed that "Defendants also deny revocation hearings within 60 and even 90 days to a small but significant number of alleged parole violators," they were in "clear violation of *Morrissey.*"

## B

1. *Preliminary "hearings."* The first problem—one unfortunately not mentioned by the parties—is the incongruity between the district court's opinion and its order. While the opinion speaks of the need for "preliminary *hearings,*" the order requires something different: the Board must "provide a prompt preliminary *interview* when a warrant issued by the Board has been executed against a parolee for a parole violation...." (emphasis added). As a matter of constitutional law, we cannot make sense of this portion of the injunction. The Board's rules already grant each parolee the right to a preliminary interview, "without unnecessary delay." § 219.1. There is no indication that the Board is ignoring the rule. One might suppose there is difference be-

tween a "prompt" preliminary interview, as the court ordered, and one held "without unnecessary delay," as the Board's rule provides. But we cannot imagine how that would amount to a difference of constitutional magnitude and, in any event, the district court never hinted that it did. This would be cause enough to reverse the portion of the order regarding preliminary interviews.[6] It is, after all, the order which is appealable, not the court's opinion. 28 U.S.C. § 1291.

We suppose it is possible that the district court considered an interview and a hearing as synonymous, although the terms have always carried quite different legal connotations. In its opinion, the court spoke about allowing the parolee to "speak, present information, and question adverse witnesses." This seems to assume that the Board must call witnesses, which is scarcely what one would expect to occur in an interview. As we have said, the parties make nothing of the terms of the court's order. They pay attention only to the court's opinion. Their arguments proceed on the assumption that the court enjoined the Board to hold an evidentiary hearing for the purpose of determining whether probable cause supported the warrant. Even if that assumption is correct, we would still reverse this portion of the order.

In discussing what sort of informal process is required before parole can be revoked, the *Morrissey* Court began with the proposition that "due process is flexible and calls for such procedural protections as the particular situation demands." 408 U.S. at 481, 92 S.Ct. at 2600. In many cases, the Court said, there is "a substantial time lag between the arrest and the eventual determination" and parolees are often held at places far from where they were arrested. *Id.* at 485, 92 S.Ct. at 2602. The two parolees in *Morrissey* were held 100 and 250 miles away from

where they were arrested, and the parties disputed whether either parolee ever received a revocation hearing of any kind. *Id.* at 473, 92 S.Ct. at 2596. The Court held that "[g]iven these factors, due process *would seem to require* that some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest as promptly as convenient after arrest." *Id.* at 485, 92 S.Ct. at 2602 (emphasis added). The purpose of this minimal inquiry was to determine if probable cause supported the arrest. *Id.* at 487, 92 S.Ct. at 2603. The decision-maker could be an administrative officer, but not the person—such as the parole officer— "initially dealing with the case." *Id.* at 486, 92 S.Ct. at 2603. Before the final revocation determination, the parolee also had a right to a hearing within a reasonable time, at which he could present evidence and examine witnesses. *Id.* at 488, 92 S.Ct. at 2603–04.

The *Morrissey* Court disclaimed any intent of imposing "an inflexible structure for parole revocation procedures." *Id.* at 490, 92 S.Ct. at 2604. The task of writing such "a code of procedure" was the responsibility of each state. *Id.* at 488, 92 S.Ct. at 2604. The Court specifically rejected the argument that persons facing parole revocation must receive the same level of procedural protection provided to criminal defendants. "No interest would be served by formalism in this process; informality will not lessen the utility of this inquiry in reducing the risk of error." *Id.* at 487, 92 S.Ct. at 2603. While stating broadly that parolees have to be given the right to confront and cross-examine witnesses in both preliminary and final revocation hearings, the Court recognized that parolees need not receive these rights when "an informant would be subjected to risk of harm if his identity were disclosed" or when a hearing

---

6. In the absence of a due process violation, the district court had no authority to order the Board to comply with its own procedures. The mere fact that a state or local government has established certain procedures does not mean that those procedures thereby become substantive liberty interests entitled to federal constitutional protection. *Brandon v. District of Columbia Bd. of Parole*, 823 F.2d 644, 648–49 (D.C.Cir. 1987). To hold otherwise would " 'federalize'— indeed, 'constitutionalize'—every deviation from

state procedures." Instead, "[s]uch state procedural requirements must be enforced in state courts under state law." *Id.* at 649. Therefore, it was improper for the district court to order the Board to conduct prompt preliminary interviews. For the same reason, we affirm the district court's refusal to order the Board to comply with §§ 204.1, 204.19–.22, 219.1, 219.3, 219.8, and 219.12 of its regulations, as the plaintiffs had requested in Count IV of their complaint.

officer found "good cause" to deny such process. *Id.* at 487, 489, 92 S.Ct. at 2603, 2604.

The following year, in *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), the Court held that a probationer arrested in Cook County, Illinois, and later incarcerated in Green Bay, Wisconsin, without a hearing was entitled to a preliminary and final revocation hearing under the conditions specified in *Morrissey. Id.* at 782, 93 S.Ct. at 1759–60. The Court cautioned, however, that *Morrissey* did not require live testimony in all cases; "affidavits, depositions, and documentary evidence" might suffice. *Id.* at 783 n. 5, 93 S.Ct. at 1760 n. 5. Neither did *Morrissey* "foreclose the states from holding both the preliminary and the final hearings at the place of violation or from developing other creative solutions to the practical difficulties of the *Morrissey* requirements." *Id.*

A few years later, the Court said that no preliminary hearing is required if the parolee has already been convicted of a subsequent offense. *Moody v. Daggett,* 429 U.S. 78, 86–89 & n. 7, 97 S.Ct. 274, 278–80 & n. 7, 50 L.Ed.2d 236 (1976). One state supreme court has held that preliminary hearings are unnecessary if final revocation hearings are held within 30 days of arrest. *State v. Myers,* 86 Wash.2d 419, 545 P.2d 538, 544 (1976) (in banc), *cited with approval in Pierre v. Washington State Bd. of Prison Terms,* 699 F.2d 471, 473 (9th Cir.1983); *see also State v. DeLomba,* 117 R.I. 673, 370 A.2d 1273, 1275 (1977) (probation).

To this line of authority must be added *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), decided under the Fourth Amendment. The defendant had been arrested on the authority of a prosecutor's information. The Court held that a judicial probable cause determination was necessary but that the state need not provide an adversary proceeding with the attendant rights to counsel, confrontation, cross-examination, and compulsory process. *Id.* at 119–22, 123, 95 S.Ct. at 865–67, 867–68. Probable cause, the Court held, "traditionally has been decided by the magistrate in a nonadversary proceeding on hearsay and written testimony, and the Court has approved these informal modes of proof." *Id.* at 120, 95 S.Ct. at 866.

There is a close analogy between the procedures of the Board of Parole and the issuance of arrest warrants in criminal cases and there is a large difference between the situation here and the one presented in *Morrissey.* Parole violators in the District of Columbia are taken into custody for parole violations only after the Board of Parole or a member thereof issues a parole violator warrant based on a determination of probable cause to believe the parolee committed a new offense or violated a condition of release. D.C.Mun.Regs. tit. 28, §§ 217.3, 217.5, 217.7. In this respect, the Board functions as does a magistrate in deciding whether to issue an arrest warrant. The standard in both instances is the same— probable cause; both proceedings are nonadversary; the evidence considered may be hearsay and in writing; live witnesses need not be called; and the target of the arrest is, for obvious reasons, not present.[7] If that is constitutional in the criminal context—and it is—one would suppose it to be constitutional in the context of parole revocation. On the other hand, the parole system in *Morrissey* authorized the parole officer supervising the parolee's release to direct his arrest. For that reason (and because the parolee might be arrested far from the place of his later incarceration) the *Morrissey* Court held that the parolee was entitled to an informal proceeding before an independent decisionmaker—such as a member of

---

7. When the only basis for the warrant is the parolee's alleged commission of a new offense, the Board must make a "written determination" that:

   there is probable cause to believe that the parolee has committed the crime for which he or she was arrested and as to the following:
   (a) Risk to the community if the parolee is allowed to remain on parole;
   (b) History of the parolee while under supervision;
   (c) Whether the parolee has other outstanding criminal charges; and
   (d) Seriousness of the offense for which the parolee has been arrested.

   D.C.Mun.Regs. tit. 28, § 217.3.

the Board of Parole—in order to determine whether probable cause existed for the arrest. The difference here is significant—the Board or its member makes the probable cause determination before the arrest.[8] A neutral decisionmaker is in all cases interposed between the parole officer and the parolee before the parolee is taken into custody. This, in the words of *Gagnon*, 411 U.S. at 783 n. 5, 93 S.Ct. at 1760 n. 5, is the District's "creative solution" to the problem *Morrissey* addressed.

▮ Our only hesitation in pronouncing the District's pre-revocation hearing procedures constitutionally sufficient stems from the second of *Gerstein's* two grounds for distinguishing *Morrissey*. A preliminary parole revocation hearing, the *Gerstein* Court wrote, "more than the probable cause determination required by the Fourth Amendment, serves the purpose of gathering and preserving live testimony, since the final revocation hearing frequently is held some at some distance from the place where the violation occurred." 420 U.S. at 121 n. 22, 95 S.Ct. at 867 n. 22. The Court added that "revocation proceedings may offer less protection from initial error than the more formal criminal process...." *Id.* at 121–22 n. 22, 95 S.Ct. at 867 n. 22. The Court's first ground for differentiating the process of issuing arrest warrants—in which live testimony is not required—cannot support a parolee's constitutional right to live testimony before his revocation hearing. There is no reason to believe parole violators in the District of Columbia are frequently detained far from the place of their violations. Given the small size of the District, there is every reason to believe the opposite. As to the Court's second ground for distinguishing *Morrissey*, it is doubtless true that revocation hearings in the District are less formal than criminal trials. But we are not sure where this consideration should lead. The *Gerstein* Court could hardly have meant that because a revocation hearing is less formal and less elaborate than a criminal trial, pre-revocation procedures must be more formal and more elaborate than pre-trial criminal procedures. *Morris-*

*sey* stressed again and again that informal procedures would suffice and that the "full panoply of rights due a defendant in [a criminal prosecution] does not apply to parole revocations." 408 U.S. at 480, 482, 487, 92 S.Ct. at 2600, 2600–01, 2603. Furthermore, it is far from clear what the *Gerstein* Court sought to convey by comparing criminal trials with revocation hearings in terms of "protection against initial error"—if, by "initial error," the Court meant an improper arrest. A criminal trial, we would have thought, serves a function other than giving "protection" against arrests made on less than probable cause. A defendant's acquittal does not show that he was wrongly arrested; it shows only that the government did not prove his guilt beyond a reasonable doubt. And a defendant may be convicted through overwhelming proof even if, at the time of his arrest, the police did not have enough evidence to support the warrant. Much the same reasoning applies to revocation hearings, although the standard of proof is preponderance of the evidence.

▮ At any rate, the *Gerstein* Court's lone statement about the need for protecting against initial errors strikes us as an extremely thin reed on which to rest a constitutional mandate that the Board must hold evidentiary hearings to determine probable cause despite the Board's already having made the necessary probable cause determinations in the same manner as magistrates issuing arrest warrants in criminal prosecutions. *Morrissey*, 408 U.S. at 481, 487, 490, 92 S.Ct. at 2600, 2603, 2604–05, and later *Gagnon*, 411 U.S. at 783 n. 5, 788, 790, 93 S.Ct. at 1760 n. 5, 1762–63, 1763–64, said that due process requirements are flexible and variable, that the procedures may be informal; that there should be "an uninvolved person to make [the] preliminary evaluation of the basis for believing the conditions of parole have been violated." *Morrissey*, 408 U.S. at 486, 92 S.Ct. at 2602. In an analogous circumstance, *Gerstein* also emphasized the need to view the State's pretrial procedure "as a whole." 420 U.S. at 124, 95 S.Ct.

---

8. A District of Columbia parole officer must submit a request for a warrant to the Board, presenting the evidence upon which the request rests and giving a detailed report regarding the parolee's overall adjustment under parole supervision. D.C.Mun.Regs. tit. 28, § 213.10.

at 868. Here, the Board's determination of probable cause is not the last step before the revocation hearing. Each parolee taken into custody has the right to a prompt preliminary interview. D.C.Mun.Regs. tit. 28, § 219.1. Although there is no requirement under District law for live witnesses at the interview, the parolee is notified of the substance of his alleged violations and of the rights that will be afforded him in the revocation hearing, which fulfill at least part of the function of a preliminary hearing. Furthermore, all parties agree that under the Board's policy—of which more in a moment—final revocation hearings must be held within 30 days of execution of parole violator warrants. Consolidating the preliminary and final revocation hearings into a single proceeding is constitutionally permissible. *E.g., Gagnon*, 411 U.S. at 783 n. 5, 93 S.Ct. at 1760 n. 5; *Pierre*, 699 F.2d at 473. Without the pre-detention determination of probable cause and without the preliminary interview, the Board's holding of final revocation hearings within the short space of 30 days may thus itself fulfill the demands of due process. With those other procedures in place, the Board's system is constitutionally sufficient.

■■■ *2. Revocation Hearings.* The final issue is presented by the district court's order that the Board conduct all final parole revocation hearings within 90 days of the warrant's execution, despite the fact that the Board has neither a policy nor a practice of refusing to provide revocation hearings within that time. The district court was impressed by evidence that the Board "den[ies] revocation hearings within 60 days and even within 90 days to a small but significant number of alleged parole violators." This evidence cannot support the court's order. *See Rizzo v. Goode*, 423 U.S. 362, 379–80, 96 S.Ct. 598, 608–09, 46 L.Ed.2d 561 (1976). Injunctive relief is warranted in this type of § 1983 action only if there is "a pervasive pattern ... flowing from a deliberate plan by the named defendants." *Id.* at 375, 96 S.Ct. at 606 (internal quotations omitted). To establish the existence of such a pattern, plaintiffs must show either that the local officials had direct responsibility for allegedly unconstitutional behavior or that the incidence of such misconduct was more severe than else-

where; an "unadorned finding of a statistical pattern" is not sufficient. *Id.* at 375–76, 96 S.Ct. at 606–07. Applying *Rizzo* in *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C.Cir.1977), this court declined to sustain an injunction absent any showing that the defendants "directed, authorized or approved" the allegedly unconstitutional conduct. *Id.* at 122 (citing also *Washington Free Community, Inc. v. Wilson*, 484 F.2d 1078, 1081–82 (D.C.Cir.1973)). Even if mistakes were made in some instances, "it is not reasonable to extrapolate a general policy of lawlessness from such mistakes." 566 F.2d at 123.

The District's regulations require revocation hearings to be held within 60 days of the preliminary interview (§ 219.3), and the parties agree that Board policy requires revocation hearings to be held within 30 days after notice of a warrant's execution. If the Board's policy is followed, the District's system clearly comports with due process. *Morrissey*, 408 U.S. at 488, 92 S.Ct. at 2603–04. There is no indication that any of the individual defendants ordered, authorized, or approved deviations from the norm. *Washington Mobilization Committee*, 566 F.2d at 122. In the end, the district court simply relied on the kind of "unadorned statistical evidence" deemed insufficient in *Rizzo*, 423 U.S. at 375, 96 S.Ct. at 606. This was especially unwarranted because extended delays may well be reasonable in individual cases; everything depends on the reason for the delay. *Moody*, 429 U.S. at 86–87, 97 S.Ct. at 278–79; *cf. Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101 (1972). We therefore conclude that the evidence is insufficient as a matter of law to support the injunction ordering the Board to conduct revocation hearings within 90 days.

### III

We reverse the district court's order requiring the District of Columbia Board of Parole to hold parole hearings far enough in advance of prisoners' parole eligibility dates so that prisoners may be released on that date if the Board's decisions are in favor of parole; requiring the Board to provide cer-

tain material to prisoners to assist them in understanding the Board's parole decisions in their cases; and, with respect to parole revocations, requiring the Board to offer prompt "preliminary interviews" after parole warrants are executed and to provide parole revocation hearings no more than 90 days thereafter. We affirm the district court's order refusing to enjoin the defendants to comply with the Board's procedural regulations.

*Affirmed in part, reversed in part.*

TATEL, Circuit Judge, concurring in part and dissenting in part:

I concur in two portions of the court's opinion. I agree that the district court properly refused to require the District of Columbia Board of Parole to comply with its own procedural regulations. I also agree that we cannot sustain the district court's order requiring the Board to hold final revocation hearings within ninety days.

With respect to the court's reversal of the district court's requirement of timely parole hearings, I concur in the judgment and in part of the court's reasoning. I agree with my colleagues that *McRae v. Hyman,* 667 A.2d 1356 (D.C.1995), a decision of the District of Columbia Court of Appeals rendered after the district court issued its injunction, makes clear that the D.C. Court of Appeals interprets the District of Columbia parole regulations as never requiring the Board to grant parole to any inmate. I therefore agree that the parole regulations do not give rise to a constitutionally protected liberty interest. I write separately on this point for two reasons: to explain why I believe that the principle established in *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979), and *Board of Pardons v. Allen,* 482 U.S. 369, 373–76, 107 S.Ct. 2415, 2418–20, 96 L.Ed.2d 303 (1987)—that statutory or regulatory language requiring the parole of certain prisoners gives rise to a constitutionally protected liberty interest—does and should survive *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); and to emphasize that whether the presence of discretion

is fatal to claims such as those that appellees raise depends on the type of discretion conferred.

The final issue in this case involves individuals who, after earning their release on parole, are later rearrested for allegedly violating the terms of their parole. Although some parolees are rearrested because, in the view of the Board or a member of the Board, probable cause exists to believe that they have committed other crimes, the District of Columbia parole regulations authorize rearrest when there is probable cause to believe that a parolee has violated even a minor condition of parole, D.C.Mun.Regs. tit. 28, § 217.5 (1987), such as keeping a parole officer informed of residence and work, *see* § 207.6(j), remaining within fixed geographic limits, *see* § 207.6(c), and following "all instructions" of a parole officer, § 207.6(*l*). Because the court reverses the injunction's requirement that the District of Columbia offer prompt preliminary hearings to parolees who are rearrested for violating parole conditions, individuals charged with violating even minor conditions of parole may wait in jail for up to thirty days before having an opportunity to show that they have been wrongfully arrested—that is, that the Board lacked probable cause to believe that they violated a condition of parole. In my view, the District of Columbia regulations that permit this do not satisfy the due process requirements of *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). I respectfully dissent.

I.

In determining whether the District of Columbia parole regulations create a liberty interest in parole, my colleagues follow *Greenholtz* and *Allen,* but they do so hesitantly, suggesting that in light of the Supreme Court's recent decision in *Sandin,* "[w]here the Supreme Court stands on this subject is no longer certain." Maj. op. at 1417. In my view, *Sandin* does and should leave *Greenholtz* and *Allen* in place. In *Sandin,* the Court restricted its discussion to claims based on changes in conditions of confinement, nowhere suggesting that it was overruling or altering its parole precedents. Indeed, the Court cited *Allen* immediately

after stating, "we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Sandin,* —— U.S. at ——, 115 S.Ct. at 2300. My colleagues agree that, notwithstanding the *Sandin* Court's disparagement of the search for liberty interests in mandatory language, *see id.* at —— – —— & n. 5, 115 S.Ct. at 2298–2300 & n. 5; *see also id.* at ——, 115 S.Ct. at 2303 (Ginsburg, J., dissenting) (suggesting that protected liberty interests derive from the Due Process Clause itself, not "from mandatory language in local prison codes"), the Supreme Court has not instructed lower courts to abandon this approach in the context of parole. *See* Maj. op. at 1418. Whatever the merits of the distinction between mandatory and discretionary language when only minor conditions of confinement are at stake, I think the distinction makes sense in the context of determining whether a prisoner has a protected liberty interest in parole. Parole decisions do not simply implicate minor conditions of confinement, but instead determine whether a person will be free from physical restraint, undeniably a liberty interest and one of great substance. Under the Due Process Clause, the government may imprison a person only pursuant to law. Where, through the use of mandatory language, a jurisdiction's law requires the release of certain prisoners prior to the expiration of their sentences, keeping such persons imprisoned for the duration of their sentences deprives them of liberty absent legal authorization and thus without due process of law. The principle embodied in *Greenholtz* and *Allen* is therefore sound: Laws requiring parole of prisoners under certain specified circumstances give rise to a constitutionally protected liberty interest.

In determining whether the appellees have a constitutionally protected liberty interest in parole, the key question is therefore whether the District of Columbia parole regulations require the Board to grant parole under certain circumstances. The D.C. Court of Appeals has recently made clear that it interprets the regulations as not ever requiring the Board to release a prisoner on parole. *See McRae,* 667 A.2d at 1360–61 (holding that the parole regulations' "numerical system is not a rigid formula ... because the Board is not required to either grant or deny parole based upon the score attained"). Because we are bound by D.C. Court of Appeals interpretations of District of Columbia municipal regulations, *McRae* is fatal to appellees' claim that the regulations are sufficiently mandatory to create a liberty interest in parole.

Were we called upon to interpret the regulations afresh, I would reach a different conclusion, the same conclusion that the district court reached. *McRae* and other D.C. Court of Appeals cases interpreting the parole regulations have focused on the regulations' grants of considerable "discretion" to the Board without carefully considering what sort of discretion the regulations confer. The Supreme Court has distinguished between two types of discretion, one of which is perfectly compatible with the existence of a liberty interest. As the Supreme Court explained in *Allen:*

> [T]he [*Greenholtz*] Court made a distinction between two entirely distinct uses of the term discretion. In one sense of the word, an official has discretion when he or she "is simply not bound by standards set by the authority in question." In this sense, officials who have been told to parole whomever they wish have discretion. ... But the term discretion may instead signify that "an official must use judgment in applying the standards set him [or her] by authority"; in other words, an official has discretion when the standards set by a statutory or regulatory scheme "cannot be applied mechanically." The Court determined in *Greenholtz* that the presence of official discretion in this sense is not incompatible with the existence of a liberty interest in parole release when release is *required* after the Board determines (in its broad discretion) that the necessary prerequisites exist.

*Allen,* 482 U.S. at 375–76, 107 S.Ct. at 2419 (quoting RONALD DWORKIN, TAKING RIGHTS SERIOUSLY 31–32 (1977)) (citations omitted) (pronoun alteration in *Allen*).

In my view, the language of the District of Columbia parole regulations in effect at the time of the district court order suggests that,

in cases not presenting unusual circumstances, the regulations confer on the Board of Parole only the second form of discretion—the power to use judgment in applying specified standards—not the relatively more unbounded first form of discretion. Although amendments to the regulations—replacing the word "shall" with the word "may" in three subsections and repealing the regulations' parole calculation worksheets—went into effect after the district court entered its order, *see* Technical Amendments Act of 1994, D.C.Act 10–302, § 52(c)–(f), 41 D.C.Reg. 5193, 5203 (1994), D.C.Law 10–255, 42 D.C.Reg. 2729 (1995) (effective date May 16, 1995), I discuss here the earlier version of the regulations, which would arguably govern the parole decisions for some members of the plaintiff class.

Section 204 of title 28 of the District of Columbia Municipal Regulations, entitled "Procedures for Granting Parole," uses mandatory language throughout. It first provides:

> As its criteria for determining whether an incarcerated individual shall be paroled or reparoled, the Board *shall* use the criteria set forth in this section and Appendices 2–1 and 2–2 to this chapter. These criteria consist of pre and post-incarceration factors which enable the Board to exercise its discretion when, and only when, release is not incompatible with the safety of the community. Any parole release decision falling outside the numerically determined guideline *shall* be explained by reference to the specific aggravating or mitigating factors as stated in Appendices 2–1 and 2–2.

D.C.Mun.Regs. tit. 28, § 204.1 (1987) (emphases added). Subsection 204.2 then provides that "[t]he Board *shall* assign each candidate for parole a salient factor score (SFS)" for use in calculating parole eligibility. § 204.2 (emphasis added). Subsection 204.4 states that "[f]or the purposes of calculating the SFS, the Board *shall* assign a numerical value to each" of six categories, including, for example, prior convictions and incarcerations. § 204.4 (emphasis added). For each of these six categories, the regulations instruct the Board that it "*shall*" or

"*shall not*" count or consider specific circumstances. § 204.5–.16 (emphases added). Appendix 2–1 of the regulations includes a score sheet for calculating the SFS. Subsection 204.17 provides that "[t]he Board *shall* use the parole candidate's SFS to determine which [of four] risk categor[ies] applies to the candidate." § 204.17 (emphasis added). In accordance with Appendix 2–1, points are assigned to each risk category. The Board is then instructed that, in determining whether a candidate should be granted parole, it "*shall* consider" nine enumerated "pre and post incarceration factors" based on institutional behavior and whether the prisoner's current or past convictions involved the use of violence, weapons, or drugs. § 204.18 (emphasis added). A scoresheet in Appendix 2–1 assigns points for each of these factors. The regulations then provide that, after the Board has assigned an inmate a score between 0 and 5, "[p]arole *shall* be granted" for certain scores, with the degree of supervision varying based on the score, and "[p]arole *shall* be .denied" for other scores. § 204.19–.21 (emphases added). Finally, subsection 204.22 of the regulations provides:

> The Board may, in unusual circumstances, waive the SFS and the pre and post incarceration factors set forth in this chapter to grant or deny parole to a parole candidate. In that case, the Board shall specify in writing those factors which it used to depart from the strict application of the provisions of this chapter.

A "Decision Worksheet" in Appendix 2–1 lists possible reasons for a parole decision "outside of the Guidelines." Among the reasons are specific items such as "[r]epeated failure under parole supervision," as well as general fill-in-the-blank items such as "[o]ther" pre-incarceration factors and "[o]ther [post-incarceration] change in circumstances."

Analyzed in terms of the two types of discretion discussed in *Allen,* these regulations seem to provide that the Board may, depending upon the circumstances, exercise both forms of discretion. When a prisoner's case is unusual, the Board has free rein to decide whether or not to grant parole, provided that it state its reasons. In the ab-

sence of unusual circumstances, however, the language of the regulations appears to require the Board to grant parole to prisoners with qualifying scores. In determining whether unusual circumstances are present, the Board exercises the second form of discretion—using its judgment in applying a set of specified standards. Although one of the criteria on which the Board may base a finding of unusual circumstances—"[o]ther"—leaves the Board considerable flexibility, the Board's discretion is· constrained by the requirement that any factor listed as "[o]ther" must indeed render the prisoner's case "unusual."

If we were free to interpret the regulations this way, they would give rise to a protected liberty interest in parole under *Greenholtz* and *Allen*. Because the D.C. Court of Appeals has authoritatively interpreted the regulations to provide that the Board is never required to abide by the numerical scoring system, however, I agree that the regulations do not create a liberty interest in parole.

### II.

Unlike my colleagues, I believe that the Board's failure to provide prompt preliminary hearings upon executing parole revocation warrants places it in violation of *Morrissey*. *Morrissey* holds that the Due Process Clause entitles a person whose parole is revoked to two hearings: first, after a parolee's arrest and detention for an alleged parole violation, a prompt " 'preliminary hearing' to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions," 408 U.S. at 485, 92 S.Ct. at 2602; and second, a final revocation hearing "lead[ing] to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation," *id.* at 488, 92 S.Ct. at 2603. The *Morrissey* Court explained that, although the preliminary hearing is to be informal, *see id.* at 487, 92 S.Ct. at 2603, due process requires that the probable cause determination "be made by someone not directly involved in the case," *id.* at 485, 92 S.Ct. at 2602; that the parolee be given notice of the preliminary hearing, its

purpose, and the alleged parole violations, *id.* at 486–87, 92 S.Ct. at 2602–03; that the parolee be permitted to speak and present evidence and witnesses at the hearing, *id.* at 487, 92 S.Ct. at 2603; that the parolee be permitted to confront and cross-examine adverse witnesses, unless "an informant would be subjected to risk of harm if his identity were disclosed," *id.;* and that the hearing officer state the reasons for his or her decision and identify the supporting evidence, *id.*

Although the District of Columbia Board of Parole has a policy requiring the Board to hold final revocation hearings within thirty days after the Board is notified that a parole warrant has been executed, the Board does not provide a preliminary hearing of the sort required in *Morrissey*. Instead, the District offers a "preliminary interview" at which the parolee receives notice of the parole conditions allegedly violated and is informed of what his or her rights will· be at the subsequent parole revocation hearing. *See* D.C.Mun.Regs. tit. 28, § 219.1 (1987). Because the parolee has no opportunity to contest the finding of probable cause supporting the parole warrant, the interview does not satisfy the requirements of *Morrissey*. For this reason, the district court found the Board in violation of the Due Process Clause. Although the district court's order required the District to hold "a prompt preliminary interview," *Ellis v. District of Columbia*, No. 91–3041, at 2 (D.D.C. Mar. 30, 1995) (order), the opinion accompanying the order indicates that the district court actually intended to direct the Board to provide "the preliminary hearings required by *Morrissey*," *Ellis v. District of Columbia*, No. 91–3041, slip op. at 40 (D.D.C. Mar. 30, 1995) (mem.). Because the parties seem to agree that what the district court's order requires is a *Morrissey*-style preliminary hearing, were this court to share the appellees' views of the due process issues in this case, we could easily resolve the discrepancy between the district court's order and its opinion either by remanding for clarification or by modifying the order ourselves.

Even assuming that the district court's order requires the Board to hold prompt preliminary hearings of the sort described in

*Morrissey*, however, my colleagues conclude that the Board's procedures, including both a preliminary interview and a final revocation hearing within thirty days, satisfy the demands of the Due Process Clause. The court treats *Morrissey* as simply announcing a procedure required in like cases. I disagree. The *Morrissey* Court issued a broad ruling, one that it obviously knew might require states to modify their existing parole revocation procedures. Although acknowledging that many states had already devised parole revocation procedures of their own, *see Morrissey*, 408 U.S. at 488 n. 15, 92 S.Ct. at 2604 n. 15, and that the requirements of due process are flexible, the *Morrissey* Court nevertheless identified certain basic requirements that the states must follow. The Court's statement that the *Morrissey* requirements "should not impose a great burden on any State's parole system," *id.* at 490, 92 S.Ct. at 2604, likewise suggests that the Court expected the states to implement those requirements. The Court's limitation of its holding to "future revocations of parole," *id.*, further demonstrates the Court's recognition that it was imposing requirements not previously followed by all states. Acknowledging that it could not "write a code of procedure" because "that is the responsibility of each State," the Court saw its decision in *Morrissey* as "deciding the minimum requirements of due process." *Id.* at 488–89, 92 S.Ct. at 2604.

The Court's intention in *Morrissey* to impose a two-hearing requirement on all states is clear from *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), in which one year after *Morrissey* the Court extended the same due process protections to probation revocations. *See id.* at 782, 93 S.Ct. at 1759–60. In *Gagnon*, the Court described *Morrissey* as follows:

> Specifically, we held that a parolee is entitled to two hearings, one a preliminary hearing at the time of his arrest and detention to determine whether there is probable cause to believe that he has committed a violation of his parole, and the other a somewhat more comprehensive hearing prior to the making of the final revocation decision.

*Id.* at 781–82, 93 S.Ct. at 1759. In response to Wisconsin's argument that the *Morrissey* requirements would cause practical problems for states with interstate compacts regarding supervision of probationers and parolees, the *Gagnon* Court was unmoved, stating: "Some amount of disruption inevitably attends any new constitutional ruling. We are confident, however, that modification of the interstate compact can remove without undue strain the more serious technical hurdles to compliance with *Morrissey*." *Id.* at 782 n. 5, 93 S.Ct. at 1760 n. 5.

In support of their efforts to limit *Morrissey* to its facts, my colleagues point out that the *Morrissey* Court offered two justifications for the two-hearing requirement: that "[t]here is typically a substantial time lag between the arrest" and the final parole revocation determination, and that "it may be that the parolee is arrested at a place distant from the state institution, to which he may be returned before the final [parole revocation] decision is made." *Morrissey*, 408 U.S. at 485, 92 S.Ct. at 2602. The uses of the word "typically" and the phrase "it may be," however, show the Court's awareness that substantial time lags between arrest and final revocation hearing do not always occur and that the place of arrest and the place of the final hearing may not always be distant. The Court nevertheless issued a broad, general rule requiring all states to offer preliminary hearings in addition to final revocation hearings. Nothing in *Morrissey* suggests that the preliminary hearing requirement would not apply to a small state where a great distance between the place of arrest and the place of the final hearing would be unlikely or that the requirement would not apply in any case in which distance was not a problem. Limiting a case to its facts may well be appropriate when applying our own precedents, but as a lower federal court we are required to follow the directives of the Supreme Court even when those directives extend beyond the facts of the case announcing them.

I recognize that in *Morrissey* the Court did not intend to establish an absolutely inflexible scheme. Indeed, in *Gagnon* the Court stated that it did not "intend to fore-

close the States ... from developing ... creative solutions to the practical difficulties of the *Morrissey* requirements." 411 U.S. at 783 n. 5, 93 S.Ct. at 1760 n. 5. Absent instruction from the Supreme Court that states may water down the *Morrissey* requirements, however, a court trying to determine whether a jurisdiction's procedures are an acceptable "creative solution" to the difficulties imposed by *Morrissey* should test those procedures by asking whether they guarantee parolees substantially all the protections that the *Morrissey* procedures provide. *Moody v. Daggett*, 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), is a good example. There, the Court held that a preliminary hearing is not necessary when a parolee is convicted of a subsequent offense, for the subsequent conviction obviously establishes probable cause that the parolee violated parole conditions. *Id.* at 86 n. 7, 97 S.Ct. at 278 n. 7. A parolee convicted of a subsequent offense loses nothing when a state offers no preliminary hearing at which to contest probable cause for parole revocation; the parolee has already had an opportunity to contest the government's charges under a standard of proof more favorable to the parolee than would be available in a *Morrissey* preliminary hearing.

My colleagues regard as a constitutionally acceptable "creative solution" the District's requirement of a pre-detention finding of probable cause by a neutral administrator and provision of a preliminary interview followed by a final revocation hearing within thirty days. Even if the Constitution permits states to "[c]onsolidat[e] the preliminary and final revocation hearings into a single proceeding," *see* Maj. op. at 1424, I do not think that a thirty-day delay is constitutionally acceptable. Under *Morrissey*'s dual hearing structure, a wrongfully detained parolee must be given a prompt opportunity to contest the probable cause finding and perhaps regain his or her liberty. But under the District's procedures, a parolee wrongfully detained—perhaps on account of a misunderstanding on the part of a parole officer as to the parolee's whereabouts or satisfaction of parole conditions—can sit in jail for thirty days with no opportunity to demonstrate that the Board lacks probable cause to believe

that he or she violated the conditions of parole. To me, this does not satisfy *Morrissey*'s requirement of a preliminary hearing held "as promptly as convenient after arrest." *Morrissey*, 408 U.S. at 485, 92 S.Ct. at 2602.

Although the Ninth Circuit has ruled that a preliminary hearing is not required if a state provides a final parole revocation hearing within twenty-one days, *see Pierre v. Washington State Bd. of Prison Terms & Paroles*, 699 F.2d 471, 473 (9th Cir.1983), and some state courts have reached similar conclusions for periods of thirty days or less in cases involving parole or probation revocation, *see, e.g., State v. Myers*, 86 Wash.2d 419, 545 P.2d 538, 544 (1976) (en banc) (upholding provision of a single probation revocation hearing within thirty days of issuance of arrest warrant), the Seventh Circuit has suggested in dictum that even a ten-day delay in holding a preliminary hearing may violate the *Morrissey* standard, *see Luther v. Molina*, 627 F.2d 71, 75 n. 3 (7th Cir. 1980). As the Seventh Circuit explained, "Chief Justice Burger [in *Morrissey*] seemed to be contemplating an almost immediate hearing; one which would occur even before the parolee was transported to federal prison." *Id.* at 74 n. 3. The Seventh Circuit noted that when Congress revised the federal parole system a few years after the *Morrissey* decision, it provided among its changes that a parolee alleged to have violated a parole condition is entitled to a "preliminary hearing ... without unnecessary delay, to determine if there is probable cause to believe that he has violated a condition of his parole." *Id.* at 74–75 (quoting 18 U.S.C. § 4214(a)(1)(A)) (ellipsis in original; internal quotation marks omitted). The Senate Report accompanying the bill introducing the "without unnecessary delay" language stated: "The timing of the preliminary hearing is particularly crucial; even if probable cause is not found, if a parolee is held in jail awaiting his hearing for more than one or two days, his job will probably be lost and his reintegration efforts badly disrupted." *Id.* at 74 n. 3 (quoting S.REP. No. 369, 94th Cong., 1st Sess. 25–26 (1975), *reprinted in* 1976 U.S.C.C.A.N. 335, 347) (internal quotation marks omitted). Of course,

the views of members of Congress are not dispositive of the constitutional issues this case presents. But in evaluating whether the thirty-day period during which District of Columbia parolees may be incarcerated without an opportunity to be heard satisfies the *Morrissey* requirements, I find it telling that the authors of the Senate Report accompanying legislation implementing *Morrissey* thought that any delay lasting over two days would be problematic.

As my colleagues suggest, the holdings of *Morrissey* and *Gerstein v. Pugh*, 420 U.S. 103, 123, 95 S.Ct. 854, 867–68, 43 L.Ed.2d 54 (1975), appear to be in considerable tension. Although *Morrissey* says that the Constitution requires an early opportunity to contest probable cause when a parolee is rearrested for violating parole conditions, *Gerstein* holds that the Constitution does not guarantee such an opportunity when a person is first detained for allegedly committing a criminal act. Although the reasoning of *Gerstein* may cast some doubt on *Morrissey*'s rationale and although the *Gerstein* Court's efforts to distinguish *Morrissey* were not entirely convincing, *see* Maj. op. at 1422–23, in my view, the most important message for lower courts to carry away from the *Gerstein* Court's attempts to distinguish the two cases is that the Court left *Morrissey* in place. The *Gerstein* Court stated: "In *Morrissey v. Brewer* and *Gagnon v. Scarpelli*, we held that a parolee or probationer arrested prior to revocation is entitled to an informal preliminary hearing at the place of arrest, with some provision for live testimony." *Gerstein*, 420 U.S. at 121 n. 22, 95 S.Ct. at 867 n. 22 (citations omitted). In explaining one year later in *Moody* that no preliminary hearing is required when a parolee has been convicted of a subsequent offense, the Supreme Court spoke of "the preliminary hearing which *Morrissey requires* upon arrest for a parole violation." *Moody*, 429 U.S. at 86 n. 7, 97 S.Ct. at 278 n. 7 (emphasis added).

A further reason to follow *Morrissey* in spite of *Gerstein* lies in the different constitutional bases for the two decisions. While the Court based its holding in *Morrissey* on the Due Process Clause of the Fourteenth Amendment without mention of the Fourth Amendment, *see Morrissey*, 408 U.S. at 472, 92 S.Ct. at 2596, it rested its holding in *Gerstein* on the Fourth Amendment, which it held alone "define[s] the 'process that is due' for seizures of persons or property in criminal cases, including the detention of suspects pending trial," *Gerstein*, 420 U.S. at 125 n. 27, 95 S.Ct. at 868 n. 27. In justifying its exclusive reliance on the Fourth Amendment, the *Gerstein* Court explained that "[t]he Fourth Amendment was tailored explicitly for the criminal justice system," and "the Fourth Amendment probable cause determination is in fact only the *first* stage of an elaborate system, unique in jurisprudence, designed to safeguard the rights of those accused of criminal conduct." *Id.* In contrast, the Court in *Morrissey* stated that "the revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations." *Morrissey*, 408 U.S. at 480, 92 S.Ct. at 2600. Perhaps, then, the Due Process Clause affords more procedural protections in the preliminary stage of the parole revocation process than does the Fourth Amendment in the pretrial phase of a criminal prosecution because the protections in a criminal trial exceed those in a final parole revocation hearing.

Whatever the merits of distinguishing between parole revocation proceedings and pretrial detention on the ground that the former is governed by the Due Process Clause while the latter is governed by the Fourth Amendment, the distinction may still be alive and well. In another context, in *United States v. James Daniel Good Real Property*, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), the Supreme Court recently stated that although the civil forfeiture of property is governed by both the Fourth Amendment and the Due Process Clause, "the arrest or detention of criminal suspects ... [are] subjects [the Court] ha[s] considered to be governed by the provisions of the Fourth Amendment without reference to other constitutional guarantees." *Id.* at ——, 114 S.Ct. at 499. The Court noted that "unlike the seizure [of real property in a civil forfeiture proceeding] ... the arrest or detention of a suspect occurs as part of the regular criminal pro-

cess, where other safeguards ordinarily ensure compliance with due process." *Id.* *James Daniel Good* thus supports the notion that because of the extensive protections ultimately afforded in a criminal trial, the procedural protections required in the preliminary stages of a criminal prosecution may be fewer than the protections required in the preliminary stages of other sorts of proceedings.

If the Due Process Clause is what governs the process due in parole revocation procedures, then the Court's recent holding in *James Daniel Good* that, absent exigent circumstances, the Due Process Clause requires the government to provide notice and an opportunity to be heard before seizing real property (presumably for even a day) in a civil forfeiture case, *see* 510 U.S. at ——, 114 S.Ct. at 505, suggests that parolees detained for alleged parole violations are entitled to prompt probable cause hearings within a matter of days. Even if we doubted the possibility of satisfactorily reconciling *Morrissey, Gerstein,* and property seizure cases such as *James Daniel Good,* the proper course for us with respect to this issue would be the same course we follow today with respect to the supposed tension between *Greenholtz* and *Allen* on the one hand and *Sandin* on the other: We should apply the decision that is "directly on point." Maj. op. at 1418. As the Supreme Court explained in a passage that the majority today quotes in Part I.B. of its opinion: "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to the Supreme Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989). I would thus follow *Morrissey* despite any doubt that *Gerstein* may cast on *Morrissey*'s rationale. *Morrissey* concerns parole revocation; *Gerstein* does not.

Although I thus agree with the district court that the Board's failure to provide preliminary hearings violates *Morrissey,* I would modify the district court's order to make it inapplicable to cases in which the basis for parole revocation is the parolee's conviction of another offense. This modification would be necessary to conform the order to *Moody*'s holding that *Morrissey*'s preliminary hearing is not required in such circumstances. *See Moody,* 429 U.S. at 86 n. 7, 97 S.Ct. at 278 n. 7.